

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-1999

# In Re: Rockefeller

Precedential or Non-Precedential:

Docket 98-5394

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: Rockefeller" (1999). *1999 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-5394 & 98-5395

IN RE: ROCKEFELLER CENTER PROPERTIES, INC.
SECURITIES LITIGATION

      FRANK DEBORA;
      WILSON WHITE;
      STANLEY LLOYD KAUFMAN, JR.;
      JOSEPH GROSS,
      Appellants at No. 98-5394

      CHARAL INVESTMENT COMPANY, INC,
      a New Jersey Corporation; C.W. SOMMER & CO.,
      a Texas Partnership, on behalf of themselves and
      all others similarly situated; ALAN FREED;
      JERRY CRANCE; HELEN SCOZZANICH;
      SHELDON P. LANGENDORF; RITA WALFIELD;
      ROBERT FLASHMAN; and RENEE B. FISHER
      FOUNDATION, Renee B. Fisher Foundation, Inc.,
      Appellants at No. 98-5395

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 96-cv-00543
(Honorable Roderick R. McKelvie)

Argued March 10, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges

(Filed July 19, 1999)

MICHAEL D. DONOVAN, ESQUIRE
 (ARGUED)
Donovan & Miller
1608 Walnut Street, Suite 1400
Philadelphia, Pennsylvania 19103

JAMES C. STRUM, ESQUIRE
PAMELA S. TIKELLIS, ESQUIRE
Chimicles & Tikellis
One Rodney Square
P.O. Box 1035
Wilmington, Delaware 19899

 Attorneys for Appellants

MAX GITTER, ESQUIRE (ARGUED)
Paul, Weiss, Rifkind, Wharton
 & Garrison
1285 Avenue of the Americas
New York, New York 10019-6064

 Attorney for Appellees,
Goldman Sachs Mortgage Co.,
Whitehall Street Real Estate
Limited Partnership V, W.H.
Advisors, Inc. V, WH Advisors, L.P.
V, The Goldman Sachs Group,
L.P., Goldman, Sachs & Co., and
Daniel M. Neidich

RICHARD D. ALLEN, ESQUIRE
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

RUSSELL E. BROOKS, ESQUIRE
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, New York 10005

 Attorneys for Appellee,
David Rockefeller

2

ROBERT K. PAYSON, ESQUIRE
ARTHUR L. DENT, ESQUIRE
Potter, Anderson & Corroon
Hercules Plaza
1313 Market Street
P.O. Box 951
Wilmington, Delaware 19899

 Attorneys for Appellees,
Peter D. Linneman and
Richard M. Scarlata

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This securities appeal arises from the acquisition of Rockefeller Center Properties, Inc. by a group of investors led by Whitehall Street Real Estate Limited Partnership V. Plaintiffs are former Rockefeller Center Properties, Inc. shareholders who allege the proxy statement and other documents prepared in connection with the acquisition were materially misleading because they failed to disclose (1) that the Whitehall Group was negotiating to sell roughly 20% of Rockefeller Center to General Electric following the acquisition and (2) that, as a result of the acquisition, the Whitehall Group would own transferable development rights (air rights) associated with Rockefeller Center.[1] The District Court granted defendants summary judgment on both claims, holding the failure to disclose such negotiations and the acquisition of development rights was not material. We will vacate and remand its grant of summary judgment on plaintiffs' sale negotiations claim but will affirm the grant of summary judgment on the transferable development rights claim.

_____

1. Defendants include some members of the Whitehall Group, some of their affiliates and former officers and directors of Rockefeller Center Properties, Inc.

3

I.

Rockefeller Center Properties, Inc. was a real estate investment trust created in 1985 via a $750 million initial public offering of common stock. Rockefeller Center Properties, Inc. used the offering proceeds together with $550 million raised through the sale of discounted debentures to make a $1.3 billion loan to Rockefeller Center Properties and RCP Associates, two partnerships (the "Partnerships")2 that at the time owned most of Rockefeller Center, in midtown Manhattan. To secure the loan, Rockefeller Center Properties, Inc. received two mortgages on the Partnerships' interests in Rockefeller Center.

In the fall of 1994, Rockefeller Center Properties, Inc. realized it lacked sufficient cash to make upcoming debenture payments. In order to avoid default, it signed financing agreements with Whitehall Street Real Estate Limited Partnership V and Goldman Sachs & Co. Whitehall agreed to make a $150 million loan to Rockefeller Center Properties, Inc. in exchange for an assignment of part of the Rockefeller Center mortgages, warrants for Rockefeller Center Properties, Inc. stock and "excess" cash. Goldman Sachs bought $75 million of Rockefeller Center Properties, Inc. debentures in exchange for a seat on Rockefeller Center Properties, Inc.'s board of directors. Goldman Sachs subsequently designated defendant Daniel M. Niedich, who served as a director until August 1995.

Rockefeller Center Properties, Inc.'s financial problems were soon compounded by the Partnerships' financial problems. On May 11, 1995, the Partnerships filed for Chapter 11 bankruptcy and ceased making mortgage payments. Realizing that without these payments it would soon be unable to meet its own financial obligations, Rockefeller Center Properties, Inc.'s board of directors began to consider recapitalization and acquisition proposals. Three groups expressed significant interest. The first group was led by Samuel Zell, a Chicago real-estate

---

2. The partnerships were owned by The Rockefeller Group, Inc. ("RGI"), which was in turn owned by the Mitsubishi Estate Co. of Japan and Rockefeller family trusts.

investor, and included General Electric Company, whose subsidiary the National Broadcasting Company leased approximately 20% of Rockefeller Center. The second was led by Gotham Partners, L.P., an investment firm that held 5.6% of Rockefeller Center Properties, Inc.'s shares. The third group included Whitehall Street Real Estate Limited Partnership V, Goldman Sachs & Co., Daniel M. Niedich and David Rockefeller. On August 11, 1995, Rockefeller Center Properties, Inc. entered into a combination agreement with the Zell Group, in which the Zell Group pledged a $250 million cash capital contribution plus $700 million in new financing. The agreement also contained an escape clause under which Rockefeller Center Properties, Inc. could terminate the combination plan and pursue another proposal it considered superior.

In the fall of 1995, the Partnerships filed a Chapter 11 reorganization plan in which they agreed to transfer full ownership of Rockefeller Center to Rockefeller Center Properties, Inc. Also in the fall, the Zell, Gotham and Whitehall Groups continued to submit additional proposals to Rockefeller Center Properties, Inc. In September, Rockefeller Center Properties, Inc.'s board rejected the Whitehall Group's offer to buy out Rockefeller Center Properties, Inc. for $100 million, an amount that equaled $6.50 per share. It also rejected the Gotham Group's $105 million rights offering proposal. But in November the board unanimously approved the Whitehall Group's all-cash merger bid of $8.00 per share, believing this offer was superior to the Zell Group's final bid, which contained both cash and debt components and was valued at $7.65 to $7.76 per share.[3] At about the same time, Rockefeller Center Properties, Inc., Whitehall and Goldman Sachs entered into a rights offering agreement under which Rockefeller Center Properties, Inc. would be able to make a $200 million public rights offering[4] if Rockefeller Center

_____

3. The Whitehall Group's $8.00 per share bid appears to represent a 50% premium over the price of Rockefeller Center Properties, Inc. stock before the bidding for Rockefeller Center Properties, Inc. began.
4. In a rights offering, an issuer's existing shareholders "are granted the opportunity (i.e., right) to purchase [a] new offering of shares, usually at a discount below their current market price."See JAMES D. COX ET AL., SECURITIES REGULATION 217 (2d ed. 1997).

Properties, Inc.'s shareholders did not approve the Whitehall Group's bid.

On February 14, 1996, Rockefeller Center Properties, Inc. filed a final proxy statement regarding the Whitehall Group's proposed merger with the SEC and distributed it to shareholders. The proxy statement represented that Rockefeller Center Properties, Inc.'s board believed the company might not remain solvent if the merger failed and explained that the rights offering might be pursued if the merger were rejected. It also stated that the board believed the rights offering, even if successful, would not allow Rockefeller Center Properties, Inc. to take ownership of Rockefeller Center. In addition, the proxy statement mentioned an appraisal valuing Rockefeller Center at $1.25 billion. The appraisal stated that this amount did not include any transferable development rights, or air rights,[5] associated with Rockefeller Center because Rockefeller Center Properties, Inc.'s mortgage did not encumber those rights.

The proxy statement also contained a detailed description of the Whitehall Group's plans if the merger were approved. It stated that the Whitehall Group would take title to Rockefeller Center and raise at least $430 million in debt financing, part of which would be used to repay Rockefeller Center Properties, Inc.'s existing debt.

In addition, the proxy statement contained references to possible "credit lease financing" transactions with General Electric. Specifically, it described a September 1995 transaction in which Rockefeller Center Properties, Inc.,

_____

5. In New York City, a real property owner who acquires air rights from another property can develop his own property beyond the limits zoning laws would otherwise impose. Air rights are created when "owners of real property [do] not develop[ ] their property to the full extent" allowed by the zoning laws. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 113-14 (1978). Air rights associated with a property designated as a landmark--as Rockefeller Center is--have a limited number of possible purchasers: the rights may be transferred only to directly adjacent lots within the same block, lots directly across the street and any lot that is part of a chain of lots under common ownership with the landmark and separated from the landmark only by streets.

General Electric and a Zell affiliate agreed to modify NBC's lease so that Rockefeller Center Properties, Inc. could obtain credit lease financing6 and referred to the February 1996 Schedule 13E-3 in which Rockefeller Center Properties, Inc. reported this transaction with the SEC. The possibility of a lease modification was also briefly mentioned in documents presented to Rockefeller Center Properties, Inc.'s board by the company's financial advisors and later filed with the SEC. Finally, the proxy statement mentioned the possibility of "a credit leasefinancing arrangement relating to a lease from, or guaranteed by, GE" in connection with the rights offering. It does not appear that the proxy statement mentioned whether the Whitehall Group contemplated pursuing a lease financing with NBC, General Electric or anyone else.

Accompanying the proxy statement were a letter signed by Rockefeller Center Properties, Inc.'s president and its chairman of the board as well as a letter from the board. The first letter described the rights offering agreement, stating that Rockefeller Center Properties, Inc. had not decided whether it would pursue such an offering if the merger failed. The second letter stated that the board had unanimously approved the merger.

On March 25, 1996, Rockefeller Center Properties, Inc.'s shareholders approved the merger. Soon thereafter, the Bankruptcy Court approved the Partnerships' reorganization plan, which transferred Rockefeller Center to the Whitehall Group.

On April 23, 1996, Rockefeller Center Properties, Inc. agreed to sell General Electric the property subject to the NBC lease for $440 million, an amount defendants claim was equal to the present value of the future payments due under the lease. A May 6, 1996 Wall Street Journal article

---

6. A credit lease financing is a form of asset securitization in which the right to receive future lease payments is sold for the present value of those payments. See RICHARD R. GOLDBERG, "Commercial Real Estate Securitization: Capital Markets Financing for Debt and Equity," 2 MODERN REAL ESTATE TRANSACTIONS 1745 (11th ed.). Foran overview of asset securitization, see generally Steven L. Schwarcz, The Alchemy of Asset Securitization, 1 STAN. J.L. BUS. & FIN. 133 (1994).

describing the sale mentioned that General Electric and NBC had been considering this transaction for over two years. In a June 6, 1996 New York Daily News article, an NBC executive vice president stated that NBC began thinking about the transaction in 1995.

II.

Plaintiffs filed suit on November 15, 1996, claiming that defendants violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. S 78aa et seq., and SEC rules promulgated thereunder through misstatements and omissions in connection with their acquisition of Rockefeller Center Properties, Inc. Plaintiffs made essentially four allegations, two of which they raise on appeal: first, that defendants failed to disclose the Whitehall Group's intention to sell a portion of Rockefeller Center to General Electric, and second, that defendants failed to disclose the existence of the air rights and the fact that the Whitehall Group would acquire them if its merger bid were approved.[7]

On April 30, 1997, defendants filed a motion to dismiss, supporting this motion with an affidavit containing, inter alia, a 1994 appraisal of Rockefeller Center and newspaper articles discussing the 1995 "bidding war" for Rockefeller Center Properties, Inc. Defendants also referred to a January 1997 affidavit containing several documents Rockefeller Center Properties, Inc. had filed with the SEC. Plaintiffs responded to defendants' motion on July 9, 1997, submitting the Form 10-K Rockefeller Center Properties, Inc. filed with the SEC in 1996, the Form 10-K the Rockefeller Center Properties Trust filed in 1997, two bankruptcy disclosure statements filed by the Partnerships

_____

7. In District Court, plaintiffs also claimed that defendants failed to disclose the interest of certain companies in leasing property at Rockefeller Center at "premium rates" and alleged that defendants "understated the potential alternatives to the merger" with the Whitehall Group. The District Court granted defendants summary judgment on these claims because it concluded the misstatements or omissions plaintiffs alleged were not material. These claims have not been raised on appeal.

8

and a transcript from the Partnerships' bankruptcy hearings.

On October 7, 1997, the court heard argument on the motion to dismiss. Following argument, plaintiffs submitted a letter from Winthrop, Stimson, Putnam & Roberts, a New York law firm, to the New York City Planning Commission regarding the Rockefeller Center air rights. Later, plaintiffs also submitted two newspaper articles "discussing the interest of several parties in Rockefeller Center."

The District Court issued its ruling on December 7, 1997. Because the court had considered "affidavits and other evidence submitted by the parties," it converted the motion to dismiss into a motion for summary judgment under Rule 12(b). The District Court granted defendants summary judgment with respect to the General Electric sale negotiations claim. After suggesting that defendants' disclosure may have been sufficient, the court observed that "[p]laintiffs offer no proof that defendants knew of the details of [the General Electric] transaction at the time of the Proxy Statement or the shareholder vote." But the court decided it need not resolve either issue because it concluded the General Electric transaction was not materially different from the potential lease financing disclosed in the proxy statement. It reasoned that because both a sale and a lease financing provide an "immediate source of cash," they are economically identical. It added that because General Electric's general interest in Rockefeller Center was "well-known," the details of the potential transaction were not material. Finally, the court noted that General Electric was a rival bidder but did not offer more than the Whitehall Group, a fact which suggested to the court that no reasonable shareholder would have considered the potential sale of part of Rockefeller Center important in deciding how to vote on the merger.

The District Court refused to grant defendants summary judgment on plaintiffs' transferable development rights (air rights) claim. Finding the proxy statement did not disclose that Rockefeller Center Properties, Inc. would acquire the air rights when it acquired Rockefeller Center, the court then examined whether this omission was material. The

9

court determined it could not conclude the air rights were immaterial because it had no evidence to support defendants' claims that the air rights were either impossible to value or of minimal value.

On December 23, 1997, plaintiffs moved for reargument or, in the alternative, for certification for interlocutory appeal, claiming the District Court had improperly converted the motion to dismiss into a motion for summary judgment. They also filed a Rule 56(f) affidavit documenting their need for discovery. On March 4, 1998, defendants moved for summary judgment on plaintiffs' air rights claim. They supported this motion with affidavits from Robert Von Ancken, a real estate appraiser who had appraised Rockefeller Center in 1994, and Norman Marcus, former general counsel to the New York City Planning Commission and author of many laws governing air rights. Von Ancken explained his appraisal of Rockefeller Center had ascribed no value to the air rights because the "possibility they would be sold for value was too remote and speculative." He added that only one site--Rockefeller Plaza West--could feasibly make use of the air rights and explained that Rockefeller Plaza West could obtain air rights from a number of properties other than Rockefeller Center. Based on these facts, Von Ancken stated the air rights were worth at most $8.5 million. Marcus agreed that Rockefeller Plaza West was the only practical receiving site for the air rights.

Plaintiffs responded with three declarations of their own. Michael Ryngaert, a professor of finance and former senior economist at the SEC, explained the air rights could be valued using methods employed to price stock options and concluded the omission of the air rights and the sale negotiations with NBC were, when combined, materially misleading. Mary Beach, a former senior associate director with the SEC, agreed with Ryngaert's assessment. Peter Korpacz, a real estate appraiser, valued the air rights at "at least $30 million" and disputed Von Ancken and Marcus's conclusion that a number of sites could transfer air rights to Rockefeller Plaza West.

On July 10, the District Court declined to reverse its decision to convert the motion to dismiss into a motion for summary judgment. The District Court also rejected

10

plaintiffs' claim they had not received notice of conversion as required by Rule 12(b) and Rose v. Bartle, 871 F.2d 331, 340 (3d Cir. 1989), although without explanation. The court then granted defendants' motion for summary judgment on the air rights claim. After reviewing all the evidence, the court observed the highest value assigned to the air rights was a newspaper article's $42 million estimate. The court stated that even this number was small when compared to Rockefeller Center's $1.2 billion value and therefore concluded that "no reasonable trier of fact would conclude [the failure to mention the air rights was] a material omission."

This appeal followed.

III.

Because the plaintiffs asserted claims under the Securities Exchange Act of 1934, the District Court had federal question jurisdiction under 15 U.S.C. S 78aa and 28 U.S.C. S 1331. We have jurisdiction under 28 U.S.C. S 1291.

IV.

There are two issues on appeal: whether the District Court's conversion of the motion to dismiss was proper with respect to plaintiffs' General Electric negotiations claim8 and whether the District Court correctly concluded the failure to disclose that the Whitehall Group would acquire Rockefeller Center's transferable development rights (air rights) was not material. Both issues are subject to plenary review. See Ford Motor Co. v. Summit Motor Prods. Inc., 930 F.2d 277, 284 (3d Cir. 1991) (plenary review on decision to convert); In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3d Cir. 1996) (plenary review on a grant of summary judgment).

_____

8. The propriety of conversion with respect to the air rights claims is not
at issue. The District Court did not grant summary judgment on those claims as the result of conversion but because of defendants' motion for summary judgment.

A. Conversion

1.

Fed. R. Civ. P. 12(b) provides that if on a 12(b)(6) motion to dismiss

>        matters outside the pleading are presented to and not
>        excluded by the court, the motion shall be treated as
>        one for summary judgment as provided in Rule 56, and
>        all parties shall be given reasonable opportunity to
>        present all material made pertinent to such a motion
>        by Rule 56.

The process of treating a motion to dismiss as a motion for summary judgment is known as "conversion." When reviewing a District Court's decision to convert a motion to dismiss into a motion for summary judgment, we typically examine three issues: first, whether the materials submitted require conversion; second, whether the parties had adequate notice of the district court's intention to convert; and third, if the parties did not have notice, whether the court's failure to provide notice was harmless error. See Rose v. Bartle, 871 F.2d 331 (3d Cir. 1989).9

Although the plain language of Rule 12(b) seems to require conversion whenever a district court considers materials outside the pleadings, we and other courts of appeals have held that a court may consider certain narrowly defined types of material without converting the motion to dismiss. In In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997), we held that a court can consider a " `document integral to or explicitly relied upon in the complaint.' " Burlington , 114 F.3d at 1426 (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). And in PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), we decided that a district court may examine an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff 's claims are based on the

_____

9. For a comprehensive discussion of conversion, see 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE S 1366 (2d ed. 1990 & Supp. 1999).

document." The rationale for these exceptions is that "the primary problem raised by looking to documents outside the complaint--lack of notice to the plaintiff--is dissipated `[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.' " See Burlington, 114 F.3d at 1426 (quoting Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)).10

When a District Court decides to convert a motion to dismiss into a motion for summary judgment, it must provide the parties "reasonable opportunity" to present all material relevant to a summary judgment motion. Fed. R. Civ. P. 12(b). The parties can take advantage of this opportunity only if they have "notice of the conversion." Rose v. Bartle, 871 F.2d 331, 340 (3d Cir. 1989). In Rose, we held that notice must be "unambiguous" and must "fairly apprise[ ]" the parties that the court intends to convert the motion. Id. at 341-42. We acknowledged that notice need not be express to meet these standards but recommended that District Courts provide express notice when they intend to convert a motion to dismiss. See id. at 342.11 We also suggested that notice might be provided through the court's orders or at a hearing. See id. at 341-42. In this case, plaintiffs claim they did not learn of the court's intention to convert the motion until it granted summary judgment.

2.

We believe the District Court did not provide adequate notice of conversion. The record contains no orders suggesting the District Court would convert the motion to dismiss. Nor did the District Court provide notice at the October 7, 1997 hearing on the motion to dismiss. Rather,

_____

10. For an analysis of materials courts consider on 12(b)(6) motions, see Kurtis A. Kemper, Annotation, What Matters Not Contained in the Pleadings May Be Considered in Ruling on a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or Motion for Judgment on the Pleadings Under Rule 12(c) Without Conversion to Motion for Summary Judgment, 138 A.L.R. FED. 393 (1997).

11. We reaffirm this recommendation because express notice is easy to give and removes ambiguities.

at the hearing the court repeatedly stated that it was deciding a motion to dismiss. See Appendix at 1254 ("If [plaintiffs] survive the motion to dismiss . .. ."); id. at 1273 ("I am not saying I am going to deny the motion to dismiss."); id. at 1292 ("[I]f I .. . grant the motion to dismiss . . . ."); id. (speaking of defendants' motion as "a motion to dismiss"); id. at 1294 (speculating on future proceedings if "there is a failure in the pleadings . . . .").12

Defendants maintain that plaintiffs had constructive notice of conversion because they chose to submit material beyond the pleadings.13 We note that some courts of appeals have decided a party who submits material outside the pleadings is on constructive notice of conversion. See, e.g., San Pedro Hotel Co. v. City of Los Angeles, 159 F.3d 470, 477 (9th Cir. 1998) (holding that when a party submits matters outside the pleadings, he has notice conversion may occur); Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998) (same); Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 260-61 (4th Cir. 1998) (same); Arnold v. Air Midwest, Inc., 100 F.3d 857, 859 n.2 (10th Cir. 1996) (same). But at least one other circuit has required express notice of conversion. See Jones v. Automobile Ins. Co., 917 F.2d 1528, 1532-33 (11th Cir. 1990) (holding that District Court must provide ten days "express notice"). Defendants assert we adopted a constructive notice approach in Hilfirty v. Shipman, 91 F.3d 573 (3d Cir. 1996), claiming that Hilfirty holds that a party who submits material outside the pleadings "is deemed to be on notice that the motion [to dismiss] will be converted." We disagree. Hilfirty explicitly states that the "primary

_____

12. We also note that defendants not only failed to suggest conversion was required but instead stated the court was deciding a motion to dismiss. See id. at 1272 ("I am quoting the position on a motion to dismiss."). Defendants argue that statements made at the October 7 hearing are irrelevant to the notice issue because plaintiffs submitted material beyond the pleadings only after the hearing. But both parties submitted material beyond the pleadings before October 7; defendants alone submitted twenty-two exhibits totaling more than seven hundred pages prior to the hearing.

13. For a discussion of these varying approaches, see 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE P 12.34 (3d ed. 1999).

14

reason" notice was deemed adequate was that some of the motions to dismiss had been framed in the alternative as motions for summary judgment. Hilfirty, 91 F.3d at 578-79. Because defendants' motion to dismiss here was not framed in the alternative as a motion for summary judgment, we think Hilfirty is inapposite. In addition, the District Court in Hilfirty did not expressly and repeatedly state it was deciding a motion to dismiss.

3.

A district court's failure to provide notice compels reversal unless the failure is harmless error. See Rose at 342. Failure to provide notice is harmless error if the plaintiff 's complaint would not have survived a motion to dismiss. See id. In this case the motion to dismiss must be informed by the pleading standards of the Private Securities Litigation Reform Act, 15 U.S.C. S 78u-4 et seq. In the past, we have applied the harmless error analysis where we determined the parties did not have notice of conversion. See Rose v. Bartle, 871 F.2d 331 (3d Cir. 1989), Hancock Industries v. Schaeffer, 811 F.2d 225 (3d Cir. 1987); Davis Elliott International, Inc. v. Pan American Container Corp., 705 F.2d 705 (3d Cir. 1983). In each case, we were able to determine the propriety of dismissal by applying established law to relatively straightforward allegations in the complaint. Although material beyond the pleadings had been submitted, it does not appear to have been voluminous or to have raised complex issues of pleading.

When appropriate, a court of appeals may decide a motion to dismiss even after conversion. But in cases like this one, involving complex principles of law and voluminous materials (an 1800-page Appendix), the District Court, which is familiar with the record, is better suited for this task in the first instance. Furthermore, the motion to dismiss here involves interpreting a recently-enacted law-- the Private Securities Litigation Reform Act--whose scope is still being defined. In addition, the parties briefed and argued their cases prior to our recent decision in In re Advanta Corporation Securities Litigation, #6D 6D6D# F.3d ___ (3d Cir. 1999), setting forth the pleading standard under section 78u-4(b)(2) of the Reform Act. We believe the wiser

15

course is to vacate the grant of summary judgment on this claim and remand so the parties have the opportunity to frame their arguments in light of this opinion and Advanta.

For these reasons, we will vacate and remand the District Court's grant of summary judgment on plaintiffs' General Electric sale negotiations claim.

B. Transferable Development Rights (Air Rights)

Plaintiffs assert that the failure to disclose the existence and value of the air rights was a "material omission" violating Rules 10b-5 and 14a-9.14 An omitted fact is immaterial unless "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), and unless its "disclosure . . . would have been viewed by the reasonable shareholder as having significantly altered the `total mix' of information made available." Id. In In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997), we held an omission is immaterial as a matter of law if the facts omitted "would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings." In determining the effect of an omission, we examine whether the information omitted is speculative or unreliable, see In re Craftmatic Sec. Litig., 890 F.2d 628, 644 (3d Cir. 1989), or if it is contingent. See Lewis v.

_____

14. Rule 10b-5, promulgated by the SEC underS 10(b), forbids the omission of "a material fact necessary in order to make . . . statements made . . . not misleading." In order to state a 10b-5 claim based on the omission of a material fact, a plaintiff must show"that the defendant i) made . . . omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's
injury." In re Phillips Petroleum Sec. Litig. , 881 F.2d 1236, 1244 (3d Cir.
1989).

Rule 14a-9, promulgated by the SEC under S 14(a), prohibits the solicitation of proxies by means of a proxy statement that contains a statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

Chrysler Corp., 949 F.2d 644, 652-53 (3d Cir. 1991). These considerations are especially relevant when the information omitted is "soft" information, a term which includes statements such as estimates and appraisals. See Craftmatic, 890 F.2d at 642-43.

Plaintiffs claim the District Court erred in determining the materiality of the air rights by comparing their value to the value of Rockefeller Center. Asserting that knowledge of the air rights and their value would have been important to a reasonable shareholder's decision on whether to vote for the merger, plaintiffs note their expert appraised the air rights at "at least $30 million" and that defendants had promised to pay shareholders $308 million to complete the merger. From these facts they contend a reasonable shareholder would have determined that defendants should have paid shareholders $30 million more. (This $30 million breaks down to nearly eighty cents per share--roughly ten percent of price proposed by the Whitehall Group.)

Defendants offer three reasons we should affirm the District Court's grant of summary judgment on the air rights issue. First, they claim that Rockefeller Plaza West-- the only practical receiving site for the air rights--has recently been developed without any air rights, which in their eyes "prove[s] conclusively" the air rights never had any value. Second, they contend they did disclose the Whitehall Group would acquire the air rights through the acquisition of Rockefeller Center Properties, Inc.; specifically, that Rockefeller Center Properties, Inc. documents filed with the SEC disclosed that Rockefeller Center had air rights and the Proxy Statement disclosed that the Whitehall Group would acquire Rockefeller Center through the acquisition. They contend these documents disclosed the impending transfer of the air rights because "Rockefeller Center" "naturally includes" the air rights associated with it. Finally, defendants maintain the air rights were immaterial because their sale was contingent and speculative and even the $30 million value proffered by plaintiffs was negligible compared to Rockefeller Center's $1.2 billion value and would have played no role in the reasonable shareholder's voting decision.

17

We need not decide whether $30 million is material when compared either to the $1.2 billion value of Rockefeller Center or to the $308 million plaintiffs received from the Whitehall Group because plaintiffs have provided no evidence the air rights would be sold, that the Whitehall Group planned to sell them or that one of the possible receiving sites had expressed any interest in acquiring them at any point in the future. Without such evidence, the value shareholders (as opposed to appraisers) would attach to the air rights is contingent and speculative, which weighs against a finding of materiality. In addition, full disclosure of the air rights would have mentioned not only their possible value but also the limited prospect they would ever be sold. For these reasons, we do not think disclosure of the air rights would have been important to a reasonable shareholder's voting decision. Therefore we will affirm the District Court's grant of summary judgment on plaintiffs' air rights claims.

V.

For these reasons, we will vacate and remand the District Court's grant of summary judgment on plaintiffs' General Electric sale negotiations claim but will affirm its grant of summary judgment on their air rights claim. We will remand for proceedings consistent with this opinion.

18

NYGAARD, Circuit Judge, concurring and dissenting.

I agree that the District Court's grant of summary judgment was proper as to plaintiffs' air rights claims, but for reasons different from those relied on by the majority. I also believe that although the District Court erred by converting defendant's motion to dismiss into one for summary judgment, that error was harmless.

A. Air Rights

It is undisputed that the total appraised value of Rockefeller Center was $1.25 billion. It is also undisputed that 38.2 million shares were transferred during the buyout merger and that these shares were transferred at a price of $8.00 per share. Further, the Record shows that, viewing the proffered evidence in the light most favorable to the shareholders, the highest possible value for the air rights was $42 million. By the following calculations, its "true" per share values result:1

> $1.25 billion #45# 38.2 million shares = $32.72 per share
> $1.25 billion + $42 million = $1.292 billion
> $1.292 billion #45# 38.2 million shares = $33.82 per share

Taking these figures and using basic ratios and proportions, it is clear that the resulting increase in share value is approximately 3.25%:

_____

1. Although the shareholders do not dispute the $1.25 billion or the $42 million figures, they argue that the appropriate comparison for materiality is the potential value of the air rights if the shareholders' proposed minimum value of $30 million was incorporated into the per share value. Thus, they assert that they would not have considered $8.00 per share to be a "fair" amount if they knew that the $1.2 billion appraisal did not consider the potential windfall of transferring the air rights. They suggest that the undeveloped air rights add at least an additional $0.78 to the per share value and this 10% increase in value is material. However, the shareholders' argument does not take into consideration that the $8.00 per share figure does not represent the "true" value of Rockefeller Center. Instead, it represents the distressed or
fire sale value. As such, the proper measure of value cannot be determined by merely tacking on a hypothetical value of the air rights to the $8.00 per share value.

19

$32.72/share #45# $8.00/share = $33.82/share #45# X

X = $8.26/share

$8.26/share is a value increase of approximately
3.25% over the base value of $8.00/share.

A 3.25% increase in value is immaterial. For this reason, I
conclude that the District Court properly granted summary
judgment.

Moreover, the shareholders were placed on notice that
the air rights were transferable as part of the Buyout
Merger. The 10k annual reports, which were incorporated
by reference into the proxy statements, disclosed that the
air rights were allocable to Rockefeller Center under New
York law and that under the RCPI mortgages the
partnership owners reserved the right to transfer these
rights. See JA 950 (stating that "there is allocable to the
Property the right to develop up to approximately 2.0
million square feet of floor areas" that "may be transferred
to other properties or, with the approval of the New York
City Landmarks Preservation Commission, used to
construct additional floor area within the Property," and
advising that "[t]he Borrower has reserved the right to
transfer these rights" and "all of the Borrower's rights to the
air space above the Music Hall, together with easements for
support, operations and access." The 10k annual report
also reveals that "as part of the settlement of a lawsuit,
100,000 square feet of these [air] rights were added to the
Mortgage."). I therefore conclude that the possible transfer
of the air rights was properly disclosed to the shareholders.

B. Conversion of the Motion to Dismiss Plaintiffs' General
        Electric Negotiations Claim

The majority has done a fine analysis, and I agree that
the District Court improperly converted the motion by
failing to provide the plaintiffs with adequate notice of the
conversion. I do not believe, however, that the proper
mandate is to vacate and remand. Rather, I would inquire
whether the conversion was harmless error by determining
whether the plaintiffs' claims could have been dismissed
under Rule 12(b)(6). We may affirm a judgment "if it
appears that there is no set of facts on which plaintiffs
could possibly recover." Rose v. Bartle, 871 F.2d 331, 342

20

(3d Cir. 1989) (citing Hancock Indus. v. Schaeffer, 811 F.2d 225, 229 (3d Cir. 1987)).

It is undisputed that the following documents were submitted by the parties either to support, or oppose, the motion to dismiss the GE negotiations claim:

By the shareholders:

(1) an affidavit of Pamela S. Tikellis authenticating copies of documents incorporated into the proxy statement and amended complaint including RCPI's annual reports for the years 1995 and 1996, filed on SEC Form 10-k

(2) three filings with the United States Bankruptcy Court for the Southern District of New York (the shareholders requested that the District Court take judicial notice of the bankruptcy court filings)

(3) two publicly filed letters from the New York City Planning Commission which was obtained under the Freedom of Information Act

(4) articles from the New York Times dated September 10, 1995 and September 12, 1995

(5) a Form 13D/A filed with the SEC by defendant Goldman Sachs & Co. on May 3, 1996 that was relied upon by the shareholders in their Amended Complaint

(6) the transcript of a Bankruptcy Court hearing concerning the defaulted owners' Chapter 11 plan

By the Defendants:

(1) two affidavits of Robert Payson authenticating copies of a publicly filed Proxy Statement and other SEC filings which the shareholders relied on for their claims

(2) excerpts from the defaulting owners' Second Amended Joint Plan of Reorganization filed in the bankruptcy court on February 8, 1996

(3) copies of new articles and other documents mentioned in the shareholders complaint

21

After receiving these various affidavits and other documents, the District Court converted defendant's 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment.

The general rule is that "a district court ruling on a motion to dismiss may not consider matter extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig, 114 F.3d 1410, 1426 (3d Cir. 1997); see also 5A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure S 1366, at 93 (West 1990) (observing that Rule 12(b)(6) commands a court to convert a motion to dismiss into a motion for summary judgment "[o]nce the court decided to accept matters outside the pleading"). However, we have carved out some exceptions to this general rule. For example, a " `document integral to or explicitly relied upon in the complaint' may be considered `without converting the motion to dismiss into one for summary judgment.' " Burlington Coat, 114 F.3d at 1426 (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1220 (3d Cir. 1996)). Thus, when an Amended Complaint quotes from certain press releases and public announcements, we may consider the entire text of those public statements. See Id.  (commenting that "plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them"); In  re Westinghouse, 90 F.3d 696, 707 (3d Cir. 1996).

We have also allowed a court to consider matters of public record when ruling on a motion to dismiss. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). For purposes of a motion to dismiss, however, matters of public record do not include all documents which may be accessible to the public. Rather, it has been limited to the following documents: criminal case dispositions such as convictions or mistrials, letter decision of government agencies and published reports of administrative bodies. See id. at 1197 (citations omitted). Specifically, we have excluded from our definition of public record, for purposes of a motion to dismiss, material that "might be subject to disclosure under the [Freedom of Information Act]." Id.  The reasoning for distinguishing between other recognized public documents

22

and information obtained through the Freedom of Information Act is that the public does not have unqualified access to these documents; potential obstacles exist. First, one must submit a request for the information to a Disclosure Officer. See 29 C.F.R. #8E8E # 2603.32-2603.33. Second, the request may be denied if the company or entity considers the information non-disclosable. See id. SS 2603.37-2603.38. Third, many categories of information may not be given to the public. See id.SS 2603.17-2603.19, 2603.21. Finally, a requestor may appeal a denial under the Freedom of Information Act. See S 2603.39. Thus, the two letters submitted by the shareholders that involved correspondence from the New York City Planning Commission and that were obtained through the Freedom of Information Act cannot be considered on a motion to dismiss.

First, I agree with the approach of the Courts of Appeal for the Second and Fifth Circuits and would allow the District Court to take judicial notice of all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC. See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991); Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996). As the Court of Appeals for the Second Circuit said:

> the documents are required by law to be filed with the SEC, and no serious questions as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents

> . . .

> This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements. We stress that our holding relates to public disclosure documents required by law to be filed, and

23

actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.

Kramer, 937 F.2d at 774. This approach is consistent with our practice of allowing consideration of indisputably authentic documents which serve as the basis for plaintiffs' complaint. See Pension Benefit Guar. Corp., 998 F.2d at 1196-97 (holding that "a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff 's claims are based on the document" because "[w]hen a complaint relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished").

I conclude that the District Court could properly consider the authenticated copies of SEC filings submitted by both the shareholders and the defendants, which relate to or are the basis for the shareholders' complaint, on a motion to dismiss. In sum, the documents which are properly considered on a motion to dismiss are:

(1) an affidavit of Pamela S. Tikellis authenticating copies of documents incorporated into the proxy statement and amended complaint including RCPI's annual reports for the years 1995 and 1996, filed on SEC Form 10-k;

(2) articles from the New York Times dated September 12, 1995 and referenced in first Consolidated Amended complaint;

(3) a Form 13D/A filed with the SEC by defendant Goldman Sachs & Co. on May 3, 1996 that was relied upon by the shareholders in their Amended Complaint;

(4) two affidavits of Robert Payson authenticating copies of publicly filed Proxy Statement and other SEC filings which the shareholders relied on for their claims;

(5) copies of news articles and other documents mentioned in the shareholders complaint.

24

Looking at what can be properly considered on a motion to dismiss, the District Court's error of conversion is harmless because these documents support a dismissal of the complaint for failure to state a claim.

949<!>A determination of materiality "requires delicate assessments of the inferences a `reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 2133 (1976); see Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n.11 (3d Cir. 1992). Thus, materiality is often a question for a jury. See TSC, 426 U.S. at 450, 96 S. Ct. at 2133. However, when a complaint alleging securities fraud contains claims of omissions or misstatements that are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," we may deem the misrepresentations and omissions immaterial as a matter of law. In re Westinghouse, 90 F.3d at 710; see In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir. 1989).

An omission or misrepresentation is material if"there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having `significantly altered the "total mix" of information' available to that investor." In re Westinghouse, 90 F.3d at 714 (quoting Shapiro, 964 F.2d at 281 n.11). Thus, the shareholders need not prove that disclosure of the allegedly omitted facts would have changed their vote regarding the buy-out merger. See TSC, 426 U.S. at 449, 96 S. Ct. at 2132; see also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097-98, 111 S. Ct. 2749, 2760-61 (1991).

Further, although information may be relevant and an investor may want to know that information, it may be "of such `dubious significance' as to be `trivial,' and `hardly conducive to informed decision making,' so that to reasonable shareholders, such omission must be immaterial as a matter of law." In re Westinghouse, 90 F.3d at 714 (quoting In re Westinghouse Securities Litigation, 832 F. Supp. 948, 972 (W.D. Pa. 1993) (other quotations omitted)). Additionally, we have cautioned that when plaintiffs allege a claim akin to "failing to predict the future" it is often "difficult to ascertain whether the reasonable

25

investor would have considered the omitted information significant at the time" especially "where an event is contingent or speculative in nature." Shapiro , 964 F.2d at 283. However, these "opinions, predictions and other forward-looking statements are not per se inactionable." In re Donald J. Trump Sec. Litig, 7 F.3d 357, 368 (3d Cir. 1993). Materiality of contingent or speculative information or events depends on "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Basic, Inc. v. Levinson , 485 U.S. 224, 232 (1988)(citations omitted). "If the speaker does not genuinely and reasonably believe the opinions, then plaintiffs may support a claim for misrepresentation." Id.

In light of our recent opinion in In re Advanta Securities Litigation, No. 98-1846, 1999 WL 395997 (3d Cir. June 17, 1999), plaintiffs alleging a claim under 10b-5 must" `state with particularity facts giving rise to a strong inference' of scienter." Id. at n.5 (quoting 15 U.S.C.S 78u-4(b)(2) (West Supp. 1999)). Although this pleading standard was not clear at the time plaintiffs filed their complaint, I do not believe Advanta requires a remand because plaintiffs' claims concerning the GE negotiations cannot withstand a motion to dismiss even when the more lenient requirements of Federal Rule of Civil Procedure 9(b) are applied. Further, unlike my colleagues, I do not believe that the"complex principles of law and voluminous materials" render the District Court "better suited" to determine whether plaintiffs' claims survive a motion to dismiss. I suggest the record supports the conclusion that the District Court's conversion of the motion to dismiss was harmless error.

On appeal, the shareholders raise three main arguments to support their contention that the District Court erred by granting summary judgment as to the shareholders' claims that the Board failed to disclose negotiations involving the sale of twenty percent of Rockefeller Center for $440 million. I will address each argument in turn.

1. Materiality of the Sale Negotiations was a question for
      the jury

The shareholders argue that they "had a number of choices when defendants solicited their proxies."

26

Shareholders' Br. at 35. This is a classic example of "fraud by hindsight." As the District Court observed, none of the facts presented by the shareholders, indeed, no set of facts, support the shareholders' allegations that the Investor Group did not disclose material negotiations for the sale of a part of Rockefeller Center before the Buy-out Merger vote. None of the newspaper articles reveal that firm negotiations were underway. Rather, the articles show that at some point everything under the sun was being negotiated with numerous corporate entities to salvage the financial status of Rockefeller Center. Thus, the sale of Rockefeller Center was so speculative that it was immaterial as a matter of law.

2. The Buy-Out Group's Uncorrected Denial of any Plan to Sell Part of Rockefeller Center in the Next Two Years

The shareholders also contend that Goldman Sachs and the defendants had a duty to disclose that they were contemplating a sale to GE/NBC especially in light of Goldman Sachs's statement that it did not have a plan "to sell any or all of the twelve buildings [at Rockefeller Center] in the next few years." The District Court correctly decided that non-disclosure of potential negotiations was immaterial as a matter of law. It is well settled, even mandated by SEC regulations, that a company is barred from including in proxy materials any tentative negotiations or plans, especially when those plans are only speculative. Further, this comment by Goldman Sachs cannot be attributed to the Investor Group. This statement was made on or before September 19, 1995, approximately ten to thirteen days before the Investor Group was formed. A 125. Therefore, the Investor Group and other defendants did not have a duty to update the statements originally made by Goldman Sachs.

3. A Sale is not "The Economic Equivalent" of a "Credit Lease Financing Agreement"

The District Court concluded that:

> GE's interest in RCPI and in Rockefeller Center was well known. GE was a member of one of the three major groups bidding on RCPI in the fall of 1995, and GE's involvement in the bidding process was well

documented in the Proxy Statement. Defendants specifically disclosed the agreement between GE, the Zell Group, and RCPI to arrange a `lease financing' based on GE's credit rating.

Charal Invest. Co. v. Rockefeller, Civ. A. No. 96-543-RRM, slip. op. at 16 (D. Del. Dec. 10, 1997). The shareholders urge that there is a critical distinction between a lease financing agreement and a sale to GE/NBC. According to the shareholders, a credit lease financing agreement was subject to several conditions and "[t]he Proxy Statement . . . gave no indication that the cash which could be obtained from the credit lease financing would be adequate for RCPI to own and operate Rockefeller Center." Shareholders Br. at 41. The shareholders submit that a sale, in contrast, "would have provided an immediate source of cash to RCPI without increasing the REIT's debt." Id. at 42. To support this argument, the shareholders take a passage from a Bankruptcy Court proceeding out of context and attempt to persuade this court that the statement, "The economics are so different now we ought to look at this from a different point of view" allows the "natural inference" that had the potential sale to GE/NBC been disclosed, "the cash generated by the sale would have sufficed for RCPI to assume control of Rockefeller Center without securing additional capital form its shareholders or other sources." Id. at 43. A full reading of the Bankruptcy proceeding, however, shows that this statement was made in connection to whether the Debtors' bankruptcy disclosure statement to its creditors needed updating.[2]

Moreover, the proxy materials clearly reveal that GE was interested in both RCPI and Rockefeller Center. The record shows that GE was part of the Zell Group. Therefore, if anyone would be aware of the possible sale of part of Rockefeller Center to GE, it would be GE. However, the Zell Group did not make a bid higher than the $8.00-$8.75 per share bid made by the Investor Group. As such, the District Court properly concluded that "no reasonable shareholder

_____

2. We can consider the full text of the Bankruptcy proceeding in deciding the motion to dismiss because the plaintiffs have relied on various excerpts from the proceeding in their complaint.

28

would consider the potential sale of part of Rockefeller Center to be important in deciding how to vote." Charal Investment Co., Civ. A. No. 96-543-RRM, at 17.

Additionally, the shareholders have not alleged that the refinancing agreements with Goldman Sachs were either fraudulent or illegitimate in any manner. Therefore, I do not believe that remanding the case to provide the parties an "opportunity to frame their arguments in light of. . . Advanta" is the most efficient, or even a necessary course. I would affirm.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit