**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 15-3328

———————————

CHRISTIAN R. HYLDAHL,
                    Appellant

v.

JANET DENLINGER; ENDRE BALAZS

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-14-cv-03918)
District Judge: Eduardo C. Robreno

———————————

Submitted Under Third Circuit LAR 34.1(a)
June 7, 2016

———————————

Before: CHAGARES, KRAUSE, and SCIRICA, *Circuit Judges*

(Opinion Filed: September 7, 2016)

———————————

OPINION*

———————————

―――――――――――――――

   * This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

KRAUSE, *Circuit Judge*

Christian Hyldahl appeals the dismissal of his tortious interference claim and the entry of summary judgment on his Dragonetti Act claim. For the reasons set forth below, we will affirm.

## I.    Background

Because we write primarily for the parties, we provide background only as relevant to the issues on appeal. Plaintiff-Appellant Hyldahl and Defendant-Appellees Janet Denlinger and Endre Balazs met in 2002 when Hyldahl was employed at Stanley-Laman Group and assisted them in the management of their investment portfolio. In 2005, Hyldahl left that firm and, by 2007, he had started a hedge fund called Archstone Investment Partners. He approached Denlinger and Balazs about investing with Archstone, and they ultimately invested $1,048,725.22.

Over the course of the next year, Denlinger and Balazs lost virtually all of their investment due to declining market value of the securities in which their money was invested.[1] As a result, Denlinger and Balazs filed arbitration proceedings against Hyldahl with the Financial Industry Regulatory Authority (FINRA), claiming Hyldahl engaged in misrepresentations and invested their funds in unsuitable investment vehicles. They also sued Morgan Stanley, alleging that it failed to supervise Hyldahl and, alternatively, that it misrepresented that it would be "overseeing, assisting and/or supervising Hyldahl." App. 129, 132. In response, Hyldahl filed counterclaims for breach of contract and

---

[1] A portion of Denlinger and Balazs's investment was also used to defend against unrelated litigation in which Archstone was a defendant.

2

defamation. Denlinger and Balazs eventually settled with Morgan Stanley and subsequently moved to withdraw their remaining claims after Hyldahl represented to them he had no assets from which to pay a verdict and sent them emails containing perceived threats. FINRA granted the request and closed the case, including Hyldahl's counterclaim.

During the pendency of the FINRA proceedings, both parties raised allegations of intimidation. Hyldahl claimed Denlinger and Balazs hired "a couple of thugs" who threatened him while he was driving to a friend's house. App. 212, 227. He admitted that he "did not report the incident to the police because [he] did not believe that any crime had actually taken place, nor [did he believe he] could . . . prove that anything had transpired." App. 227. For their part, Denlinger and Balazs aver that, before they moved to withdraw their claim, Hyldahl threatened them by e-mail when he told their lawyer that they were "walking a dangerous line," App. 212, and told Denlinger that he would pursue all available legal channels and would "fight with a ferocity [they] cannot imagine" if they refused to settle their claims, App. 215. And in response to their attempt to withdraw their FINRA claims, Hyldahl informed their attorney that he "train[s] regularly for all types of potentially violent scenarios" and is "legally licensed to carry a concealed weapon." App. 227. Hyldahl denied threatening Denlinger and Balazs, explaining his statements were intended to show them "that [having him followed]" would "not scare [him] or make [him] settle [the] case." App. 227.

After the FINRA case was closed, Hyldahl filed suit in the Court of Common Pleas, Philadelphia County, raising, among other things, a claim for tortious interference

3

with contractual relations on the grounds that the FINRA action led to his termination from his then-current employer, Merion Wealth Partners. Denlinger and Balazs removed the case to the U.S. District Court for the Eastern District of Pennsylvania, *see* 28 U.S.C. § 1441, and filed a motion to dismiss, which the District Court granted after ruling, among other things, that the tortious interference claim was barred by the statute of limitations. Hyldahl filed an amended complaint raising only a claim under Pennsylvania's Dragonetti Act for wrongful use of civil proceedings, which requires a litigant to prove that a lawsuit was filed for an improper purpose and that the underlying action terminated in favor of the Dragonetti plaintiff. Denlinger and Balazs filed a second motion to dismiss, which the Court converted to a motion for summary judgment. After granting the parties an opportunity to file supplemental briefing and denying Hyldahl's request for discovery, the District Court concluded that Hyldahl failed to demonstrate the FINRA case was terminated in his favor as a matter of law and issued judgment in favor of Denlinger and Balazs. Hyldahl filed a timely appeal.

II.    **Jurisdictional & Standard of Review**

The District Court had jurisdiction to hear this case under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's dismissal of Hyldahl's tortious interference claim and its entry of summary judgment on his Dragonetti claim. *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (plenary review over Rule 12(b)(6) dismissal); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (plenary review over Rule 56 entry of summary judgment). We review the Court's

4

denial of Hyldahl's discovery request for abuse of discretion. *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 310 (3d Cir. 2011).

**III. Discussion**

Hyldahl raises several challenges on appeal. First, he argues the District Court improperly calculated the statute of limitations for his tortious interference claim. Second, he argues the District Court erred in granting summary judgment on his Dragonetti claim by engaging in impermissible factfinding and erroneously concluding that the FINRA case did not terminate in his favor. Finally, he argues the District Court erred by refusing to grant him discovery. We address these arguments in turn.

**A. Tortious Interference with Contractual Relations**

The District Court dismissed Hyldahl's tortious interference claim on statute of limitations grounds after concluding that the limitations period began to run in January 2012 when Merion Wealth Partners terminated Hyldahl's employment contract. On appeal, Hyldahl argues the statute of limitations did not begin to run until Denlinger and Balazs's allegedly unlawful interference was complete—here, the date on which their FINRA case was withdrawn.

Under Pennsylvania law, the "statute of limitations begins to run only once a plaintiff can assert and maintain an action"—i.e., when all elements of the claim have been met. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). The limitations period for a claim of tortious interference with contractual relations is two years. *Id.* at 383; *see also* 42 Pa. Cons. Stat. § 5524. The elements of the claim are

(1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009) (quoting Restatement (Second) of Torts § 766 (1979)).  Because the fourth element of a tortious interference claim requires a causal link between the tortious conduct and the asserted damage, *id.*, Hyldahl must be able to show that the allegedly tortious conduct caused his termination.

Hyldahl now argues that the statute of limitations did not begin to run until his Dragonetti claim accrued on October 15, 2013, the date on which the FINRA claim was dismissed.  But the legal damage for which he seeks compensation, the termination of his employment with Merion Wealth Partners, occurred in January 2012.  Conduct occurring after Hyldahl's termination could not have caused that termination.  Instead, the limitations period began to run in January 2012 when his employment was terminated and the last element of his tortious interference claim was fulfilled.  Because Hyldahl filed suit more than two years later on February 25, 2014, his claim is barred by the statute of limitations.

**B.     Dragonetti Act Claim**

Hyldahl asserts that Denlinger and Balazs's FINRA suit constituted the wrongful use of civil proceedings pursuant to the Dragonetti Act.  The Dragonetti Act creates a cause of action "when a party institutes a lawsuit with a malicious motive and lacking probable cause." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 191 (Pa. Super. Ct. 1993).

A defendant is not liable under the act unless the underlying "proceedings have terminated in favor of the person against whom they are brought." 42 Pa. Cons. Stat. § 8351(a)(2).

Denlinger and Balazs moved for dismissal on Hyldahl's Dragonetti claim on the ground that the FINRA proceedings were not terminated in Hyldahl's favor. The District Court agreed, noting that when Denlinger and Balazs's voluntarily withdrew the lawsuit, they had already settled with Morgan Stanley, "the deep pocket in the case," and Hyldahl had no assets with which to pay a verdict. App. 40. It added that Hyldahl had sent threatening communications and promised to "pursu[e] all available legal channels against [Denlinger and Balazs]." App. 40. On appeal, Hyldahl maintains the FINRA case was terminated in his favor and the District Court engaged in improper factfinding.

"Generally, . . . whether a withdrawal or abandonment constitutes a favorable, final termination of the case against who the proceedings are brought initially depends on the circumstances under which the proceedings are withdrawn." *D'Elia v. Folino*, 933 A.2d 117, 122 (Pa. Super. Ct. 2007). A voluntary withdrawal of civil proceedings does not constitute a favorable termination unless the withdrawal was "tantamount to the unbidden abandonment of a claim brought in bad faith." *Majorsky v. Douglas*, 58 A.3d 1250, 1270 (Pa. Super. Ct. 2012). Thus, Pennsylvania courts have concluded that a withdrawal of proceedings is a favorable termination when the withdrawal occurred "on the eve of trial" and the circumstances indicated that the withdrawal was a "last-second dismissal in the face of imminent defeat." *Bannar v. Miller*, 701 A.2d 242, 245, 248 (Pa. Super. Ct. 1997); *see also Majorsky*, 58 A.3d at 1269-70. On the other hand, a

7

withdrawal of civil proceedings is not a favorable termination when the issues in the underlying litigation became moot before any determination of liability, *Rosenfield v. Penn. Auto. Ins. Plan*, 636 A.2d 1138, 1141 (Pa. Super Ct. 1994), where the parties settled the underlying litigation, *D'Elia*, 933 A.2d at 122, or when it would be impossible to bring an accused to trial, *Elec. Lab. Supply Co. v. Cullen*, 712 A.2d 304, 310 (Pa. Super. Ct. 1998).

Hyldahl argues that the question of whether the proceedings terminated in his favor should have been reserved for the jury because it involves an inquiry into Denlinger and Balazs's motive for withdrawing FINRA proceedings.[2] While a defendant's admissions could be among the circumstances that inform a determination of whether a withdrawal was a "last-second dismissal in the face of imminent defeat," *see Majorsky*, 58 A.3d at 1270, we perceive no error in the District Court's legal conclusion that Denlinger and Balazs's withdrawal of their FINRA claim did not constitute a termination favorable to Hyldahl. As the District Court observed, Denlinger and Balazs withdrew their case after they had settled with Morgan Stanley. Further, it is undisputed that Hyldahl had told them that he had no savings, so Denlinger and Balazs had every reason to think that he could not pay a verdict. *Cf. Elec. Lab. Supply Co.*, 712 A.2d at 310 (stating that the voluntary withdrawal of a claim is not a favorable termination when it

---

[2] In Pennsylvania, "the jury has only the function of finding the circumstances under which the defendant acted" and "[t]he court determines whether, under those circumstances, the termination was sufficiently favorable to the accused." *Dravo Corp. v. Ioli*, 584 A.2d 1011, 1013 (Pa. Super Ct. 1991) (quoting *Miller v. Pa. R. Co.*, 89 A.2d 809, 812 (Pa. 1952)); *see also Georgiana v. United Mine Workers of Am.*, 572 A.2d 232, 235 (Pa. Super. Ct. 1990).

would be impossible to bring the claim). It is also undisputed that Hyldahl sent communications indicating that, by maintaining their claims, Denlinger and Balazs were "walking a dangerous line" and that, shortly after they sought to withdraw their claims, Hyldahl stated that he carries a concealed weapon and trains for "violent scenarios." Because the suit served no purpose and in the face of Hyldahl's perceived threats, it is impossible to say that Denlinger and Balazs's withdrawal was "tantamount to the unbidden abandonment of a claim brought by bad faith," *Majorsky*, 58 A.3d at 1270. Accordingly, the FINRA case was not terminated in Hyldahl's favor as a matter of law, and the District Court did not err in granting summary judgment on his Dragonetti claim.

## C. Denial of Hyldahl's Discovery Request

The District Court converted Denlinger and Balazs's motion to dismiss into a motion for summary judgment. Hyldahl requested discovery to "further illuminate issues in the [summary judgment] motion and the case." App. 361. The District Court denied Hyldahl's request for discovery because he "failed to show how any additional discovery would assist him in [opposing summary judgment]." App. 38 n.4. On appeal, Hyldahl maintains that denial of discovery constituted an abuse of discretion.

The "decision to convert a motion to dismiss to a motion for summary judgment is generally committed to the district court's discretion," *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 n.11 (3d Cir. 1992), but in making this decision, a court must give the parties notice so that they may respond, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.2d 280, 287-88 (3d Cir. 1999). Because "the summary judgment process presupposes the existence of an adequate record," *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d

9

Cir. 2007), courts are "obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery," *Dowling v. City of Phila.*, 855 F.2d 136, 139 (3d Cir. 1988). However, there is no obligation to grant discovery when the information sought "would not have precluded summary judgment." *Id.* at 140.

We conclude the District Court did not abuse its discretion in converting the motion to dismiss into one for summary judgment and denying discovery. The District Court gave Hyldahl adequate notice that it was converting the motion and a reasonable opportunity to respond. Further, in view of the undisputed circumstances surrounding the termination of the FINRA proceedings, Hyldahl has failed to show that the requested discovery—regarding (1) whether Denlinger and Balazs believed their FINRA allegations were true, (2) whether another investment advisor had personal animus against Hyldahl, (3) whether the FINRA litigation led to his termination and affected his ability to attract clients, (4) the subject of discussions between Denlinger, Balazs, Hyldahl, and others leading up to Denlinger and Balazs's decision to invest with Hyldahl, and (5) the result of an SEC investigation initiated by Denlinger and Balazs—would have precluded summary judgment.

## IV. Conclusion

For the reasons set forth above, we will affirm the District Court's judgment.

10