Paul **MAJORSKY** and Margaret A. Majorsky, Appellants

v.

George A. **DOUGLAS**, an Individual, J.C. Natale, an Individual, and D.J. Hess Advertising, a Partnership, Appellees.

Superior Court of Pennsylvania.

Argued June 27, 2012.

Filed Nov. 27, 2012.

Reargument Denied Feb. 1, 2013.

James B. Lieber, Pittsburgh, for appellants.

Mark F. Fischer and Thomas S. Anderson, Pittsburgh, for Hess, appellee.

BEFORE: OLSON, J., WECHT, J., and PLATT, J.*

OPINION BY WECHT, J.:

Paul Majorsky and Margaret A. Majorsky ("Appellants") appeal the order, dated August 15, 2011, and docketed on August 26, 2011, which dismissed all of their claims against the partnership D.J. Hess Advertising ("DJH") and individuals George A. Douglas and J.C. Natale. After careful review of the lengthy record, the

* Retired Senior Judge assigned to the Superior Court.

detailed reasoning of the trial court, and the arguments of the parties, we affirm.

The trial court has provided the following thorough and incisive account of the factual and procedural history of this case:

### Factual Overview

This is a dispute between former business partners who sold promotional products (e.g., mousepads, keychains, personalized pens) manufactured by third-party vendors. Plaintiff, Paul Majorsky (hereinafter "Mr. Majorsky"), created PBK Promotional Products (hereinafter "PBK") in 1985. At the time, Mr. Majorsky was employed as a Professor of Accounting with Robert Morris University ("RMU"), an institution of higher learning in the Pittsburgh area. RMU eventually became a key customer of PBK and of Mr. Majorsky's subsequent partnership.

Because of his more than two decades of involvement in the promotional products business, Mr. Majorsky claimed certain of his customers began to refer to him as the "trinkets and trash man," and referred to him and his wife jointly as "Mr. and Mrs. PBK." Mr. Majorsky never sought intellectual property protection for these colorful monikers. Nor did he ever utilize them in any advertisements, mailings or solicitations. In 1999, while still apparently basking in the high esteem his customers afforded his name in the promotional products industry in Western Pennsylvania, Mr. Majorsky brought George A. Douglas (hereinafter, "Mr. Douglas,") into PBK as a partner. Pursuant to an oral agreement, the two men operated PBK as a 50–50 partnership. Mr. Douglas has been named as a Defendant in this lawsuit.

In 2001, Majorsky and Douglas joined with J.C. Natale, (hereinafter "Mr. Natale") to forge a new business partnership standing separately from PBK but still dealing with promotional products. That partnership became known as "D.J. Hess Advertising." All the partners owned equal shares of the partnership. However, Mr. Majorsky did perform significant administrative duties in return for additional compensation. Both Mr. Natale and [DJH] are Defendants in this lawsuit.

After purchasing [DJH],[1] Mr. Douglas and Mr. Majorsky continued to sell promotional products through PBK and Mr. Natale sold similar products through his own venture known as "Natale Sporting Goods."

In 2003 disputes arose over the partnership structures and compensation arrangements of both PBK and [DJH]. The partners of PBK (Mr. Douglas and Mr. Majorsky) moved to terminate their [PBK] partnership by drafting a handwritten document outlining details of the anticipated dissolution. . . .

In October of 2003 the majority of the partners in [DJH] (Mr. Douglas and Mr. [Natale]) voted in favor of altering the compensation scheme, while Mr. Majorsky voted against it. Thus, despite lacking unanimity, the vote resulted in a new financial arrangement. In November of 2003, because of his irreconcilable differences with his partners in PBK (Mr. Douglas) and [DJH] (Mr. Douglas and Mr. Natale), Mr. Majorsky instituted suit against Mr. Douglas and Mr. Natale. That lawsuit, identified as *Majorsky v. Douglas,* et al. (Allegheny Coun-

---

1. Evidently DJH was an extant competitor acquired by Messrs. Majorsky, Douglas, and Natale. Whether DJH was founded or acquired by the parties is immaterial to our disposition of this appeal.

ty Court of Common Pleas, No. GD 03–22473), shall be referred to throughout as the "Prior Action").

### The Prior Action

An extended overview and discussion of Mr. Majorsky's prior lawsuit against Mr. Douglas and Mr. Natale is necessary because of this Court's holding that the doctrine of *res judicata* bars and precludes many of the causes of action sought to be advanced by Mr. Majorsky in this action, particularly as relates [to] the continued "use" of Mr. Majorsky's name by the Defendants and the inclusion of his name on the [DJH] website. Moreover, in this lawsuit Mr. Majorsky pursued claims under the Dragonetti Act, which also draws the claims and defenses of the Prior Action to the fore. In the Prior Action, Mr. Majorsky filed a Complaint alleging Mr. Douglas and Mr. Natale attempted to "freeze him out" of the partnerships. Mr. Majorsky cited numerous examples of such conduct in the Complaint.[2] Mr. Majorsky sought injunctive relief to prevent ongoing harm to his business reputation. He specifically requested the Court to order the Defendants to either remove the new [DJH] website from the Internet or to correct its contents, as the site "was established with misleading or inaccurate contact information...." (Almost more than a decade later, Mr. Majorsky continues to generate litigation focused upon the content of this low tech, minimally used website).

[2] For our purposes, one such example is especially pertinent: Mr. Majorsky claimed Mr. Douglas and Mr. Natale created a new website for [DJH] that listed Mr. Douglas as the primary contact person for the business.

In August of 2004, Mr. Majorsky amended his Complaint in the Prior Action to allege the change to an incentive based allocation of profits in [DJH] occurred against his will and contrary to a binding agreement between the partners, and therefore stood contrary to 15 Pa.C.S. § 8331(8) of the Pennsylvania Uniform Partnership Act. Mr. Majorsky's Amended Complaint also provided new examples of acts by the Defendants that purportedly violated the partnership agreements and the Pennsylvania Uniform Partnership Act. Mr. Majorsky averred these actions damaged his business interests and reputation in the promotional products industry. Mr. Majorsky further requested an accounting of partnership affairs, the dissolution of the partnership, and an award of monetary damages to compensate him for the loss of his partnership interest and lost future profits....

\* \* \*

In their Answer and New Matter filed on January 24, 2005, Defendants averred that none of the acts alleged by Mr. Majorsky as "freezing him out" of the partnership breached the partnership agreement or violated Pennsylvania law. While admitting the majority of the actions attributed to them by Mr. Majorsky, the Defendants averred that these acts were necessary to sustain the business in light of Mr. Majorsky's sudden abdication of his expected administrative duties and partnership obligations. As to the specific issue of the manner in which the partners were identified on the new [DJH] website, Defendants replied as follows:

It is admitted that Douglas undertook actions to establish a website for [DJH] under the domain name www.djhessadv.com. However, it is denied that Douglas' name is listed as a primary [contact] name for sales purposes. To the contrary, Douglas'

name is listed as the primary contact name for purposes of setting up the domain and website, not for sales of products. [Mr. Majorsky's · name] along with Douglas and Natale, are all listed on the website as sales contacts. These actions were not contrary to, in breach of or in violation of the partnership agreement or the Pennsylvania Uniform Partnership Act.

Defendants' Answer also contained Counterclaims against Mr. Majorsky and sought to add an Additional Defendant to the Prior Action, his wife, Margaret "Peg" Majorsky. Defendants alleged that Mr. Majorsky's participation in a new partnership named "Peg's Custom Products"—formed by Mr. Majorsky and his wife—conflicted with Mr. Majorsky's fiduciary duties owed to [DJH]; Defendants also alleged that Mr. and Mrs. Majorsky, through "Peg's Custom Products," used information belonging to [DJH] to improperly siphon away clients and business.

The Prior Action terminated on December 7, 2006 after a four-day non-jury trial held before the Hon. Robert J. Colville. At the request of the parties, the Court entered a [Consent Verdict]. All parties agreed to Mr. Majorsky receiving a $10,000 payment for damages, which was apparently the compensation for resolving the dispute prior to final adjudication. However, the [Consent Verdict] did not set forth either the basis for recovery or the basis for the amount of the damages, nor did it explain whether the $10,000 paid to Mr. Majorsky was attributed to specific claims or counts of the second amended complaint. Most significantly for the future litigation between the parties, no settlement agreement or release was ever executed between them. The [Consent Verdict] further stated that the Court retained "jurisdiction to enter [a]

subsequent order regarding decree of dissolution of partnership(s) on agreement of counsel."

In his deposition given in this lawsuit, Mr. Majorsky testified that he received the $10,000 settlement amount, but that the parties failed to draft a mutually acceptable dissolution agreement. However, despite the lack of a formal agreement on the partnership issues, on February 22, 2007, Mr. and Mrs. Majorsky, on behalf of themselves and "Peg's Custom Products" (which had been named as well as an Additional Defendant) filed a Praecipe to Settle, Satisfy & Discontinue the Prior Action.

### *The Present Lawsuit*

Paul and Margaret Majorsky commenced this instant action (hereinafter the "Present Lawsuit") by Complaint on January 11, 2008. Despite the apparent resolution of the Prior Action, Mr. Majorsky once again alleged that Defendants wrongfully "froze him out" of [DJH]. Additional claims alleged that customers had purchased products from [DJH] under the mistaken assumption that Mr. Majorsky remained involved in the business and that the Defendants purposefully allowed and encouraged this confusion for their own financial benefit. And, yet again, Mr. Majorsky complained about inaccurate information on the [DJH] website.[4]

[4] The Majorskys did, however, change the nature of their grievance over the website from that raised in the Prior Action. There, Mr. Majorsky took umbrage over the priority status given to Mr. Douglas' name over his own. In the Present Lawsuit, Mr. Majorsky complains about the continued presence of his name on the [DJH] website from 2003 through late 2007[.]

Plaintiffs filed an Amended Complaint on May 22, 2008. On August 7, 2008, certain Preliminary Objections asserted by the Defendants to the Amended Complaint were sustained by the Hon. Robert J. Colville. Specifically, the Court dismissed Plaintiffs' ... claim pursuant to 42 Pa.C.S.A. § 8351 alleging wrongful use of civil process by the Defendants in naming Margaret Majorsky as an Additional Defendant in the Prior Action (*i.e.*, claims pursuant to the Dragonetti Act).

Subsequently, the Present Lawsuit was assigned to ... the undersigned jurist by Order dated January 12, 2010. We granted Plaintiffs leave to file a second amended complaint, which was then filed on March 10, 2010. On January 24, 2011, the parties filed cross Motions for Summary Judgment. Defendants sought summary judgment as to all counts contained within the second amended complaint.... Plaintiffs requested partial summary judgment against Defendants as to the issues of liability on Count VII (claims of breach of contract) of the second amended complaint.

In the context of the summary judgment motions decided by this Court, Plaintiffs asserted six separate claims against the Defendants. In Count I, Plaintiffs allege Defendants used the name "Paul Majorsky" in violation of the Lanham Act, 15 U.S.C. § 1225. Count II contends Defendants employed the name "Paul Majorsky" for their business interests contrary to the state statute prohibiting the Wrongful Use of Commercially Viable Likeness, 42 Pa.C.S. § 8316. Plaintiffs further allege Defendants engaged in unfair competition (Count III) and interfered with Plaintiffs' business relationships (Count IV). Via Count VI, Mr. Majorsky claims the individual Defendants perpetrated a civil conspiracy against him. Lastly, in Count VII Mr. Majorsky advances a breach of contract claim against Defendant Douglas and [DJH].

Upon consideration of the motions for summary judgment and supporting briefs filed by the parties, their respective responses thereto, along with the entire record in this case, this Court issued an Order dated August 26, 2011, which denied Plaintiffs' Motion for Summary Judgment and granted the Motion for Summary Judgment filed by Defendants, thereby dismissing all of Plaintiffs' remaining causes of action....

Trial Court Opinion ("T.C.O."), 12/6/2011, at 1–7 (some citations and typography modified for clarity; some footnotes omitted).

Appellants raise the following issues on appeal:

1. Whether the Court improperly held that *res judicata* acted as a partial bar to the claims brought by Appellants? If the Court did so err, did it make an improper finding of fact as to whether Mr. Majorsky complained of the misuse of his name on the [DJH] website after his expulsion from the [DJH] partnership in the prior action in this Court ... ?

2. Whether the Court erred in holding that Mr. Majorsky failed to state claims under the Lanham Act and for claims arising under related provisions of Pennsylvania statutory and common law (Counts I–IV and VI of [Appellants'] second amended complaint), even though the Appellants presented evidence that the listing of Mr. Majorsky as an affiliate of Appellee [DJH] on the [DJH] website was literally false? If the Court so erred, did it make improper findings of fact regarding the na-

ture of the promotional products industry, including improper findings of fact regarding Mr. Majorsky's relationships with his customers as well as an improper finding of fact that Mr. Majorsky's identity lacks any distinctive and/or secondary meaning in the Western Pennsylvania marketplace for promotional products?

3. Whether the Court improperly disposed of Mr. Majorsky's claims for breach of the "Runoff Agreement" (Count VII of [Appellants'] second amended complaint), despite the fact that the Appellants presented evidence that Appellee George A. Douglas never adhered to any of the terms of the agreement, notwithstanding the fact that he acknowledged that the "Runoff Agreement" was a binding agreement between himself and Mr. Majorsky?

4. Whether the Court improperly dismissed the Appellants' Dragonetti Act claim (Count V to Appellants' first amended complaint), even though there was no legal theory whatsoever under which Mrs. Majorsky could have been joined as a defendant in the Prior Action?

Brief for Appellants at 3–4.[2]

 At the outset, we note our time-honored standard of review:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo.*

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Jones v. Levin,* 940 A.2d 451, 452–54 (Pa.Super.2007) (internal quotation marks, modifications, and citations omitted).

### *Waiver*

Before addressing the merits of Appellants' issues on appeal, we must consider Appellees' contention that a number of Appellants' issues and sub-issues have been waived, either on the basis that Appellants failed to present these issues to

---

2. In violation of Pa.R.A.P. 2119(a) ("The argument **shall** be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein...."), Appellants' four issues as stated in their Statement of the Questions Presented on Appeal transmogrify in their argument section into seven primary issues with an additional eight sub-issues. Although we will endeavor to reorganize what Appellants have disorganized for purposes of discussion, we trust that their counsel will carefully adhere to our rules in the future.

the trial court in their concise statement of errors complained of on appeal filed pursuant to Pa.R.A.P. 1925(b) or on the basis that they failed to preserve them before the trial court in the first instance as required by Pa.R.A.P. 302(a). Such failures to preserve exceptions or assertions of error by raising them first in the trial court, and later in a Rule 1925(b) statement if one is so ordered by the trial court, usually compel a finding of waiver. *See, e.g., In re F.C. III,* 607 Pa. 45, 2 A.3d 1201, 1211–12 (2010) ("Issue preservation is foundational to proper appellate review. Our rules of appellate procedure mandate that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue."); *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 309 (1998) ("[I]n order to preserve their claims for appellate review, Appellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Rule 1925. Any issues not raised in a 1925(b) statement will be deemed waived.").

Appellees first argue that Appellants' Rule 1925(b) statement failed to raise the *res judicata* arguments they pursue in this Court. In their statement, Appellants framed their *res judicata*-related assertions of error as follows:

> Whether the Court improperly held that *res judicata* acted as a partial bar to the claims brought by the Appellants? If the Court did so err, did it make an improper finding of fact as to whether Mr. Majorsky complained of the misuse of his name on the D.J. Hess website after his expulsion from the D.J. Hess partnership in the [Prior Action]?

Rule 1925 Statement at 1. Appellants now argue that the trial court's entry of summary judgment on *res judicata* grounds conflicted with an earlier decision of the trial court denying Appellees' request for summary judgment on the same basis. Appellees contend that this argument is waived due to Appellant's failure to raise it with adequate specificity.

In their Reply Brief, Appellants respond that this issue is a fairly encompassed subsidiary issue under their broadly stated challenge to the trial court's application of *res judicata,* and thus sufficient under Rule 1925(b). They also note that this very issue was raised in their opposition to Appellees' motion for summary judgment, thus duly preserving their exception to this aspect of the trial court's ruling, satisfying Rule 302(a).

■ Appellants state a colorable claim for preservation inasmuch as **all** aspects of the trial court's reliance on *res judicata* in disposing of certain claims are implied by Appellants' broadly-stated Rule 1925 objection. In tension with this observation, however, are countervailing considerations. An overly vague or broad Rule 1925 statement may result in waiver. *See Commonwealth v. Reeves,* 907 A.2d 1, 3 (Pa.Super.2006) ("The Rule 1925(b) statement must be detailed enough so that the judge can write a Rule 1925(a) opinion...."). Although Appellants raised *res judicata* considerations broadly in their responsive briefs to Appellees' motions for summary judgment, they did not press the effect of the trial court's rulings in the instant case denying Appellees' first motion for summary judgment on the assertion of similar or identical basis in a second motion for summary judgment. Moreover, these considerations were not raised in clear terms in Appellants' Rule 1925(b) statement, and the trial court did not address them in disposing of the *res judicata* issue in its

original memorandum granting Appellees' second motion for summary judgment or in its Rule 1925(a) opinion. As well, it is not clear to this Court that this aspect of Appellants' appeal should be framed as falling within *res judicata* at all, as it appears that this argument more properly should be viewed as one involving our co-ordinate jurisdiction rule. *See Commonwealth v. King*, 999 A.2d 598, 600 (Pa.Super.2010) ("[T]he law of the case doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter.").

■ As noted, failure to raise an issue in a Rule 1925(b) statement "shall" result in waiver of that issue. *See Lord, supra.* We have no explanation of the trial court's reasoning regarding the effect of the trial court's denial of Appellees' first motion for summary judgment on its discretion in considering Appellee's second motion for summary judgment.[3] Moreover, this argument was not pursued before the trial court or encompassed in Appellants' generally stated assertion of error. Accordingly, Appellants' challenge to the application of *res judicata*, to the extent it implicates the trial court's allegedly inconsistent ruling on Appellees' first motion for summary judgment, is waived.[4]

Appellees next contend that Appellants have waived their objections to the trial court's rulings regarding their tortious interference with contractual relations and civil conspiracy claims. Appellants' assertion of error in their Rule 1925(b) statement, which is materially identical to issue 2 as stated above, contends that the trial court:

> erred in holding that Mr. Majorsky failed to state claims under the Lanham Act and for claims arising under related provisions of Pennsylvania statutory and common law (Counts I–IV and VI of [Appellants'] second amended complaint), even though the Appellants presented evidence that the listing of Mr. Majorsky as an affiliated of [DJH] on the [DJH] website was literally false....

Brief for Appellees at 17 (quoting Rule 1925 Statement at 2–3).

Appellees argue that although Appellants mentioned counts IV (tortious interference with contractual relationships) and VI (civil conspiracy) of the complaint, they characterize them, without naming them, only as claims "arising under" Pennsylvania statutory and common law provisions that are "related" to the Lanham Act. "This characterization is odd," Appellees argue, "because the claims for [tortious] interference and civil conspiracy are not in any real sense related to a Lanham Act

---

**3.** Although we find this issue waived, this Court previously has rejected the related argument that a trial court may not enter summary judgment after having previously denied preliminary objections on the same basic record. *Cf. Clearwater Concrete & Masonry, Inc. v. W. Phila. Fin. Servs. Inst.*, 18 A.3d 1213, 1216 (Pa.Super.2011) ("A trial judge may always revisit his own prior pre-trial rulings in a case without running afoul of the law of the case doctrine; by its terms, the doctrine only prevents a second judge from revisiting the decision of a previous judge of coordinate jurisdiction or of an appellate court in the

same case."), *abrogated on other grounds, Bricklayers of W. Penna. Combined Funds, Inc. v. Scott's Dev. Co.*, 41 A.3d 16 (Pa.Super.2012) (*en banc*).

**4.** Appellants' challenge to the application of *res judicata* to bar their claims to the extent they are based upon actions and events that pre-date entry of the Consent Verdict or entry of Appellants' "Praecipe to Settle, Satisfy & Discontinue" in the Prior Action has not been waived, and is addressed *infra*.

claim." *Id.* Because Appellants focus on their evidence that the listing of Mr. Majorsky on the DJH website after his exit from the partnership was "literally false," and upon the trial court's allegedly improper findings of fact regarding whether Majorsky's identity was "distinctive" or had "secondary meaning," they raise "Lanham Act and trademark concepts [that] have [no] applicability whatsoever to claims for tortious interference or criminal conspiracy." *Id.* at 18.

Appellees also argue that additional claims regarding tortious interference and civil conspiracy argued by Appellants are waived. These include challenges to the trial court's ruling that the statute of limitations bars the tortious interference claim, and that Appellants failed to proffer any evidence of damages. These claims, Appellees contend, are wholly absent from the Rule 1925(b) issues as stated, and are not subsidiary to the issues that were raised therein.

Appellants disagree, in part because "the trial court itself connected the tortious interference ... claims to the Lanham Act claims and stated that the interference claim stemmed from the erroneous inclusion of Mr. Majorsky's name on the [DJH] website after his expulsion from the DJH partnership." Reply Brief for Appellants at 3. As well, the trial court expressly granted summary judgment on the civil conspiracy claim "because it granted [Appellees'] motion as to the underlying claims." *Id.* This follows, they argue, from the assertion in Appellants' second amended complaint that the civil conspiracy count was rooted in the Lanham Act claim.

 We agree with Appellees that Appellants' challenge to the trial court's dismissal of their tortious interference claim is waived. There is no way to connect Appellants' arguments to their Rule 1925(b) statement or their statement of the questions presented on appeal in their brief to this Court, reproduced *supra.* Moreover, we find no support for Appellants' claim that the trial court considered the tortious interference claims to be of a piece with the Lanham Act claims. Accordingly, Appellants' failure to raise the tortious interference claim in its Rule 1925(b) statement requires a finding of waiver.

 Conversely, we agree with Appellants that their civil conspiracy claim has been and remains rooted in their Lanham Act claims. Hence, it is fairly encompassed by Appellants' Lanham Act issue challenge and is preserved for our review.[5]

\* \* \* \*

Having exhausted Appellees' substantial assertions of waiver, we now turn to the duly preserved issues presented by Appellants. Our discussion follows the order of Appellants' statement of the questions presented rather than the divergent organization of their argument. Below, we address, in turn, Appellants' challenges to the trial court's rulings regarding (1) the Lanham Act and civil conspiracy claims; (2) the alleged breach of the "Runoff Agreement" purporting to dissolve PBK and account for its assets; (3) the *res judicata* effect of the Prior Action; and (4) Appellants' Dragonetti Act claims, *see* 42

---

5. Below, we find waiver as to an additional aspect of Appellants' appeal—to wit, their argument that the trial court erred in declining to recognize a binding **oral** agreement that reflected the terms of the unsigned runoff agreement. As set forth at greater length below, Appellants persistently and solely argued in the trial court that the alleged breach upon which their claim rested was of the written agreement, and made no effort to develop an alternative argument based upon any oral agreement.

Pa.C.S. §§ 8351, *et seq.* for wrongful use of civil proceedings.

### *Lanham Act and Related Claims* [6]

For ease of reference, we begin by reviewing the trial court's reasoning for granting summary judgment as to Appellants' Lanham Act and "related claims." The trial court began by noting that nothing in the Consent Verdict terminating the Prior Action compelled DJH to remove Mr. Majorsky's name from the DJH website. T.C.O. at 11. Moreover, neither the pleadings nor other documents aver that Mr. Majorsky sought removal of his name from the website. *Id.* Although Mr. Majorsky held no partnership interest in DJH as of the entry of the Consent Order, his name remained on the website for approximately another year. *Id.* In any event, the trial court observed that the mere presence of Mr. Majorsky's name on the website did not constitute a Lanham Act violation. *Id.*

■ Because Mr. Majorsky never registered "Majorsky" or "Paul Majorsky" as a mark, Appellants were required to show that the name was entitled to trademark protection despite the fact that it was not registered. *Id.* at 12 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Appellants bore the burden of demonstrating that the purported mark was valid and legally protectable, that they owned the mark, and that Appellees' use of the mark caused a likelihood of confusion. *Id.* (citing *Tillery v. Leonard & Sciolla, LLP*, 437 F.Supp.2d 312, 320 (E.D.Pa.2006)). Personal names are considered "descriptive" rather than inherently distinctive, thus they are granted trademark protection "only upon a showing of distinctiveness and secondary meaning." *Id.* (quoting *Tillery*, 437 F.Supp.2d at 320–21).

A personal name acquires secondary meaning as a mark "when the name and the business become synonymous in the public mind" **and the secondary meaning "submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business."** 2 McCarthy on Trademarks 13.3 (internal

---

**6.** Appellees argue that Appellants' Lanham Act issues are waived to the extent that they are based on the assertions (a) that the advertising on the DJH website was "literally false" because the website listed Mr. Majorsky as a DJH partner as late as December 2007, and (b) that the trial court failed to understand that the Lanham Act claim asserted that certain representations were "literally false." Appellees assert that Appellants "confined [their] Lanham Act claim to trademark infringement" in the trial court. Brief for Appellees at 20. To preserve the legal theories now raised below, Appellants were required to raise them in their numerous written responses to Appellees' motions for summary judgment, which Appellees contend Appellants did not do. *Id.* at 20–26 (citing *Walsh v. Borczon*, 881 A.2d 1 (Pa.Super.2005)).

Appellees' argument is unpersuasive. Appellants' second amended complaint raised their Lanham Act issue sufficiently to establish a claim under 15 U.S.C. § 1125(a), which provides civil relief for any use of a name or mark that:

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a)(1).

Although, in the trial court, Appellants couched their arguments against summary judgment in terms of trademark and "secondary meaning," that is not conclusive, especially given the trial court's lengthy discussion of these issues. Accordingly, we will address the merits of Appellants' Lanham Act issues as stated before this Court.

citations omitted); *accord Paco Sport, Ltd. v. Paco Rabanne Perfumes,* 234 F.3d 1262, 2000 WL 1721126 (2d Cir. 2000). "Proof of secondary meaning entails vigorous evidentiary requirements.... The plaintiff must not only show that it used a personal name as a trademark, but that a substantial portion of the consuming public associates [the name] specifically with [its] business." *Flynn v. AK Peters, Ltd.,* 377 F.3d 13, 20 (1st Cir.2004) (internal citation omitted). If the mark is primarily a personal name, then the senior user must prove the existence of secondary meaning in its mark at the time and place that *the junior user first began use of that mark. Johnny Blastoff v. L.A. Rams Football Co.,* 188 F.3d 427, 433–34 (7th Cir.1999).

*Tillery,* 437 F.Supp.2d at 321 (citations modified; emphasis added).

The trial court ruled that Appellants had failed to meet this standard for a number of reasons. First, had Appellants believed the name to be a distinctive mark, they would have invoked it in some form in the name of their ventures. However, the name did not appear in even their most recent post-DJH venture, "Peg's Custom Products." Second, the court found no evidence that Appellants advertised Mr. Majorsky's mark to generate secondary meaning, aside from its appearance on promotional products for DJH which also bore the names of the other partners. The court found these materials to be analogous to business cards, and observed that to find in them a mark warranting protection would be to create a protectable mark in the name of virtually every salesman.

■ The trial court also found Appellants' proffered depositions of two of Appellants' customers and the declarations of

three others inadequate to create a disputed question of material fact. While the deponents testified that they associated Mr. Majorsky with the promotional products they purchased from him, "[n]either deponent answered the actual question before [the trial court], which is: whether upon hearing the name 'Paul Majorsky' their respective thoughts turned to promotional products rather than the corporeal person of Mr. Majorsky." T.C.O. at 14. Neither was the trial court persuaded that the three declarations, each of which contained averments of former customers that Mr. Majorsky's "reputation is such that his name is synonymous with promotional products," were sufficient to create a question of material fact requiring submission to a jury. T.C.O. at 14 (quoting declaration(s)). The court explained:

Even if one ignores the curious congruity of three "random" customers using the same phrase "synonymous with promotional products" spontaneously of their own accord, looking upon these "declarations" in the light most favorable to [Appellants], the words indicate only that Mr. Majorsky is favorably perceived by these three individuals and that they associate him with the products he touts, but their "declarations" fail to support a finding of secondary meaning under the Lanham Act.... There is no testimony that, in the minds of these individuals, the primary meaning of the name Paul Majorsky as a word identifying a person "was submerged" ["]in favor of its meaning as a word identifying that business." *Tillery,* 437 F.Supp.2d at 321. And, most importantly, the declarations do not indicate that a "substantial portion of the consuming public" finds secondary meaning in the name "Paul Majorsky." *See Tillery,* 437 F.Supp.2d at 321.

*Id.* (citations modified).[7]

Regarding Appellants' "related" claim of unauthorized use of name under 42 Pa.C.S. § 8316, the trial court found no genuine issue of material fact for fundamentally the same reasons. *Id.* at 16–17. To the above analysis, the court added the observation that Appellants failed to produce evidence that they had imbued the Majorsky name with commercial value "through the investment of time, effort and money" in excess of what any salesperson does to generate customers, as required by statute. *Id.*

The trial court cited several bases for granting summary judgment as to Appellants' Lanham Act claims. However, the principal, and in our view dispositive, basis the trial court cited was Appellants' categorical failure to establish that the Majorsky name had the "secondary meaning" undisputedly necessary to sustain such a claim. In support of their argument, Appellants primarily cite their oft-repeated, selective quotations from the declarations and deposition transcripts that they insist establish a basis upon which a jury could find secondary meaning.

Appellants correctly note that the trial court does not explicitly cite the eleven-non-exhaustive-factor test for secondary meaning. We find, however, that the court constructively applied those factors. In *AFL Phila. LLC v. Krause*, the United States District Court for the Eastern District of Pennsylvania recited the standard as follows:

[T]he Third Circuit has enumerated the following factors to guide an inquiry of whether secondary meaning exists: (1)

the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. These factors are a nonexclusive list, and therefore the absence of any particular factor does not require dismissal.

639 F.Supp.2d 512, 526 (E.D.Pa.2009) (citations omitted).

Although the trial court in the case before us did not recite this test in full, we find its stated reasoning indicative of how it viewed Appellants' evidence relative to the *Krause* factors. Factor (2), for example, goes to the heart of the trial court's ruling, which substantially relied on Appellants' failure to demonstrate **any** affirmative effort to establish a secondary meaning in its name, and in particular the fact that Appellants never opted to name a business such that it invoked the Majorsky name—an odd decision, if Appellants' grandiose claims regarding the name's synonymity with promotional products were valid. As noted, Appellants failed to provide customer surveys, the use of the mark in trade journals or their equivalent, or adequate direct evidence of customer confusion.

The three declarations cited by Appellants are short, vague, and uncannily similar. Keith Paylo, Dean of Student Affairs at Point Park University, declared:

at 15 (citing, *inter alia, A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 202 (3d Cir.1999)). Our agreement with the trial court that Appellants established no genuine issue of material fact with respect to secondary meaning renders the likelihood of confusion immaterial to our review.

---

**7.** The trial court also found no evidence that DJH's maintenance of Mr. Majorsky's name on the DJH website during the complained-of period caused the likelihood of confusion necessary to sustain a Lanham Act claim. Only if customer confusion is likely to be caused by the alleged infringer's use of the mark is such use actionable under the Lanham Act. T.C.O.

2. I presenting [*sic*] serve as Dean of Student Affairs at Point Park University.

3. I have known and worked with Paul Majorsky for approximately 15 years.

4. I have often ordered promotional products from Mr. Majorsky and have found his service and turn[-]around time to be excellent.

5. In my experience in dealing with these products and this industry his name is synonomous [*sic*] with promotional products and also he is known as "the giveaway guy" because many of his products are given away for free to recipients in the business world such as customers and students.

Declaration of Keith Paylo, 11/9/2009.

Michael McKinney, a current or former employee at II–VI, a provider of laser optics for metal working, declared:

3. Part of my job was to obtain promotional giveaway products that were imprinted with our logo including mugs, polo shirts and other items.

4. I dealt with Paul Majorsky.

5. His reputation is such that his name is synonymous with promotional products.

6. For many years I have referred to him as the "giveaway guy."

Declaration of Michael McKinney, 11/9/2009.

William Foertsch, former owner of the Shipping Center in Moon Township, which closed in or around 2006, declared:

3. I did two types of business with [Mr. Majorsky]. He provided me with promotional products. I served as his vendor for shipping.

* * *

5. While he and I did business together, his name was synonymous with promotional products in this area. To me, he was the "go to guy" on these items.

Declaration of William Foertsch, 11/9/2009.

 Even if we decline to adopt the trial court's skepticism of the repetitive use of the word "synonymous" in these three declarations, the fact remains that to say the Majorsky name was "synonymous with promotional products" is not equivalent to saying that one's name is so deeply associated with a given product or business that the individual sense of that name is "submerged" into its putative function as a trademark. *See Tillery, supra.*

The depositions of Maureen Keefer and Mary Gerard, both employees of Robert Morris University who had procured promotional items from Mr. Majorsky, where Mr. Majorsky served as a faculty member, provide no more concrete evidence than the declarations that the Majorsky name was imbued with secondary meaning. For example, Ms. Keefer attested that she had purchased promotional products from Mr. Majorsky for "a period of a couple years." Deposition of Maureen Keefer, 8/31/2010, at 12. However, she had not purchased anything from him for years before the deposition. *Id.* at 13. Instead, she indicated that she purchases promotional products from the internet and other vendors, and named four different entities, none of whom have anything to do with any of the parties to this litigation. *Id.* at 14–15. Although she did agree with counsel that "it [was] fair to say that [she] associated Paul Majorsky with promotional products," and that "others at RMU also did," she denied that she'd ever heard Mr. Majorsky referred to as "the go-to guy for promotional item[s]" or as "the trinkets and trash man." *Id.* at 16–17. Furthermore, she had no recollection of having been solicited by Mr. Majorsky at any time after 2003. *Id.* at 27.

Mary Gerard, another employee of Robert Morris University, attested to similar effect. She indicated that she purchased promotional products once or twice a year in connection with her employment in the alumni department, totaling less than $2000 per year. Deposition of Mary Gerard, 8/31/2010, at 9. She averred that she "associate[d] Paul Majorsky with promotional items." *Id.* at 13. However, like Ms. Keefer, Ms. Garrard indicated that she sourced promotional items from "a lot of other vendors." *Id.* at 16.

Upon this review of Appellants' proffered evidence *vis-à-vis* secondary meaning, we believe that the trial court correctly found insufficient evidence to warrant trial on Appellants' Lanham Act claim. Deponents Keefer and Gerard in effect testified to no more than knowing Mr. Majorsky, purchasing modest amounts of merchandise from him, and associating his name with the products he sold. Both also attested to their use of numerous other vendors for similar products. Similarly, the conclusory statements by three current or former customers deeming the Majorsky name synonymic with promotional items add little if anything of substance to augment the inadequate deposition testimony—and no credibility determinations better reserved to a jury are necessary to so conclude.

Even granting the credulity our standard of review requires, we find nothing of record, and certainly nothing with any possibility of satisfying *Tillery's* "vigorous evidentiary requirements," to establish that the Majorsky name's self-identifying function is "submerged" into its business-identifying function. 437 F.Supp.2d at 321. Nor do we discern any evidence that "a substantial portion of the consuming public associated" the name Majorsky with the promotional items business.

For the foregoing reasons, Appellants have failed to provide sufficient evidence of secondary meaning to necessitate consideration by a jury of their Lanham Act claims. Thus, the trial court did not err in granting summary judgment as to these claims.

Our resolution of this issue also answers Appellants' contention that the trial court erred in granting summary judgment to Appellees on civil conspiracy claims. Appellants' second amended complaint, their brief, and indeed their argument against waiver of that issue, addressed *supra*, all make clear that they planted both of these claims in the ground of the Lanham Act. *See* Brief for Appellants at 53 (noting that the trial court's "assumed lack of a cause of action arising from the Lanham Act" "need not be considered at length, since if the Majorskys have valid claims under the Lanham Act, they also have valid claims for civil conspiracy against Messrs. Douglas and Natale"). That claim having proved fallow, and in the absence of any indication that the asserted civil conspiracy was rooted in other claims, the claim will not lie. Thus, the trial court did not err in granting Appellees summary judgment as to that claim.[8]

8. Appellants have not effectively maintained that the same assertion of error in their Rule 1925(b) statement that raised the Lanham Act and "related claims" touched upon any claims other than their tortious interference and civil conspiracy claims. In its opinion, the trial court also considered Appellants' claims of unauthorized use of name, unfair competition, and interference with business relationship claims. T.C.O. at 16–20. Nonetheless, Appellants' Rule 1925(b) statement failed specifically to identify errors in the disposition of these claims that are not rebutted by our resolution of the Lanham Act issue. As well, Appellants fail to provide meaningful, discrete arguments pertaining to any errors regarding these claims, an omission that impairs meaningful review and typically entails

### The Runoff Agreement

██ The Runoff Agreement refers to an alleged agreement to the terms of dissolution of the PBK partnership, which initially was to be maintained by Messrs. Majorsky and Douglas, even after Messrs. Majorsky and Douglas joined Mr. Natale in DJH. By the terms of the putative runoff agreement, the PBK name would remain viable for Mr. Majorsky's use following dissolution. Appellants assert error in the trial court's determinations (a) that the purported runoff agreement was never, in fact, executed or otherwise reflective of a meeting of the minds, as required to establish a binding agreement; and (b) that any such contract, had it been formed, was tantamount to a perpetual restrictive covenant, and, as such, void and unenforceable as against the public policy of the Commonwealth. *See* Brief for Appellants at 55–64. Regarding Appellants' argument, pressed throughout this litigation, that the unsigned runoff agreement, itself, constituted an enforceable agreement, we agree with the trial court that the runoff agreement, having never been duly executed or subject to a clear meeting of the minds, was not a binding contract. To the extent Appellants now partially abandon that approach in favor of arguing for an enforceable oral contract more or less consistent with the terms of the written runoff agreement, we find Appellants' argument waived. *See Siegfried v. Borough of Wilson,* 695 A.2d 892, 894 (Pa. Cmwlth.1997) (citing *Tarter v. Linn,* 396 Pa.Super. 155, 578 A.2d 453) ("The appellate court may *sua sponte* refuse to address an issue raised on appeal that was not raised and preserved below....").

Appellants' argument that the runoff agreement document, itself, sufficed to bind the parties has been preserved. The trial court characterized the issue as stated in Appellants' Rule 1925(b) statement as one pertaining to "breach of contract and accounting." T.C.O. at 21. The proposed runoff agreement, the trial court noted, was signed by neither Mr. Majorsky nor his putative counterparty, Mr. Douglas. Mr. Douglas, who drafted the agreement, faxed the draft to Mr. Majorsky, who made handwritten changes in the margins and returned the revised draft to Mr. Douglas. The trial court therefore found:

> Even if we assume Mr. Douglas extended an offer to dissolve the PBK partnership when he faxed this document to Mr. Majorsky, it is clear Mr. Majorsky did not accept. It is black letter law that the writing in the margins constituted a counter-offer and [Appellants] have not brought forth any evidence that Mr. Douglas accepted the counter-offer, much less that Mr. Majorsky accepted the "Runoff Arrangement" as originally proffered.

T.C.O. at 21–22 (citing Restatement (Second) of Contracts § 39).

██ In extensive summary judgment briefing below, Appellants stalwartly maintained that the written runoff agreement, itself, constituted a binding contract that Mr. Douglas had breached when he allegedly poached PBK clients that Mr. Majorsky contends Mr. Douglas was bound not to approach. Now, for what appears to be the first time, Appellants maintain, questionably based on our review of the record, that "Mr. Majorsky did not argue that the Runoff Agreement document was a fully integrated contract." Brief for Appellants at 56. Instead, Mr. Majorsky came away from a "meeting with Mr. Douglas" with

waiver. *See* Pa.R.A.P. 2119. Accordingly, we find that Appellants have waived any intended arguments concerning those claims.

the **impression** that Mr. Majorsky "was to retain all of the PBK customers, divide the gross profits on sales to RMU on an equal basis, and that Mr. Douglas would retain the [DJH] customers." *Id.* (citing Second Deposition of Majorsky, 10/28/2010, at 26).[9] Appellants recite Pennsylvania's law of oral contracts, and argue on this basis that because the runoff agreement is not "a fully integrated contract, the question of what the parties had agreed to is a question of fact that should have been submitted to a jury." *Id.*

The distinction between arguing that a written contract binds the parties thereto and has been breached by a party, and arguing that a party has breached some admixture of an oral agreement and a contract that is not "fully integrated," is considerable. It is even greater when what the party asserting breach contends is a less than fully integrated contract is, in fact, an apparently unexecuted counter-offer, absent any indications of assent by the counter-offeree.[10]

Appellants may only raise any alleged breach of an oral agreement before this Court if they have already done so in the trial court. *See* Pa.R.A.P. 302(a). This case has been heavily papered and redundantly briefed by the parties. Moreover, Appellants have failed to cite clearly the place in the voluminous record where this argument was preserved, as required by Pa.R.A.P. 2119(e). Nonetheless, we will overlook the mistake to satisfy ourselves that Appellants have never until now ar-

gued that Appellees breached an oral agreement.

Appellants' first amended complaint neither explicitly nor implicitly made out a claim of breach of contract, oral or written. Rather, that claim emerged in Appellants' second amended complaint, filed by leave of court on March 10, 2012. Thus, no mention was made of breach of contract in the various filings pertaining to Appellees' first motion for summary judgment, filed on August 25, 2009, and denied on March 9, 2010.

Appellees filed a second motion for summary judgment on January 24, 2011, seeking dismissal, *inter alia*, of the various claims discussed herein, as well as Appellants' claim for breach of contract. On that same day, Appellants filed a motion for partial summary judgment seeking judgment as a matter of law for liability under count VII of their second amended complaint, which asserted breach of the runoff agreement. Nowhere in their partial motion for summary judgment did Appellants pursue relief on a theory of oral contract; rather, they sought relief only for breach of the written runoff agreement.

In opposition to Appellees' motion for summary judgment, Appellants ultimately filed several documents, none of which pursued a theory of breach of oral contract. *See* Plaintiffs' Response to Defendants' Second Motion for Summary Judgment, 3/10/2011, at 18–23; Plaintiffs' Reply Brief in Support of Plaintiff[s'] Motion for

---

**9.** As noted *supra*, evidently PBK to at least some extent remained a going concern following the parties' acquisition of DJH, although the language quoted here suggests that Messrs. Majorsky and Douglas brought some, most, or even all of the PBK clients with them into the DJH fold.

**10.** Notably, Appellants simultaneously seem to maintain that the oral contract can be

inferred, in part, from the parties' course of conduct following the exchange of runoff agreement drafts, but that Mr. Douglas more or less never complied with the terms to which they agreed. It is not essential to our ruling, but these competing propositions are untenable, and patently undermine Appellants' contention that an oral agreement ever was formed between the parties.

Summary Judgment, 3/21/2011, at 2–3; Plaintiffs' Sur–Reply Brief in Opposition to Defendants' Second Motion for Summary Judgment, 3/29/2011 (asserting no comment regarding Appellants' breach of contract claim).

Under Rule 302(a), issues not raised before the trial court are waived on appeal. As best we can discern, the question of oral contract was never squarely before the trial court, which is why it is unsurprising that the trial court offers no comment on this emergent aspect of Appellants' argument. For these reasons, we find that Appellants have waived their argument that Mr. Douglas breached a hybrid or exclusively oral agreement consistent with the terms of the unsigned runoff agreement.

### Res Judicata

As noted, we find that Appellants preserved their assertions of error in the trial court's ruling that *res judicata* barred all of their claims to the extent they sought relief for damages arising from events and actions that pre-dated resolution of the Prior Action. The court found that claims arising from such injuries within that presettlement timeframe could have been made in the Prior Action, and hence could not be pursued again in a subsequent action. *See generally* T.C.O. at 8–11; *see id.* at 9 (citing *Hillgartner v. Port Auth. of Allegheny County*, 936 A.2d 131, 141 (Pa. Cmwlth.2007)). To be clear, the trial court did not find any counts entirely barred by *res judicata*, just those claims pertaining to the presence of Mr. Majorsky's name on the DJH website specifically during the period before the formal discontinuance of the Prior Action.

Although we find that Appellants preserved their argument that this application of *res judicata* reflected an error of law, this cannot insulate that argument from the effect of our disposition of the legal issues addressed *supra*, which encompass the barred claims. We have found that each of Appellants' claims was properly disposed of by summary judgment. Our reasoning for doing so is not affected by any subset of the particular periods of time in which such injuries were alleged to have occurred, but rather upon the substance of the claims writ large. Accordingly, Appellants' argument in this regard is mooted by our rejection of Appellants' vain effort to lift their claims pertaining to the retention of Mr. Majorsky's name on the DJH website from the pit of summary judgment.

### Dragonetti Act [11]

Finally, we turn to Appellants' argument that the trial court improperly sustained Appellees' preliminary objections to Appellants' claim for wrongful use of civil proceedings. This claim inheres in the putative impropriety of the joinder of Mrs. Majorsky as a defendant in a counterclaim raised by defendants in the Prior Action.

▮ Our standard of review of a trial court ruling sustaining preliminary objections is as follows:

> [We must] determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

11. This claim is omitted entirely from Appellants' Rule 1925(b) statement, and, as such, arguably should be deemed waived before this Court. However, despite urging waiver as to several other issues, Appellees have not done so with respect to this issue. Similarly, the trial court addressed the issue in its opinion. Accordingly, our ability to review this issue is not substantially impeded, and we will address it on its merits.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Feingold v. Hendrzak,* 15 A.3d 937, 941 (Pa.Super.2011).

In rejecting Appellants' assertion of error, the trial court reasoned as follows:

Utilizing flawed and specious reasoning, [Appellants] contend that the Consent Verdict filed in the Prior Action is tantamount to the Prior Action "terminating in their favor[," as required to sustain a cause of action under the Dragonetti Act, per 42 Pa.C.S. § 8351(a)(2) ]. This position is simply incorrect.

A negotiated termination of litigation, which the Consent Verdict clearly was, does not constitute a "favorable termination" under the statute. *D'Elia v. Folino,* 933 A.2d 117, 122–23 (Pa.Super.2007). According to the instruction of the Superior Court in *D'Elia,* Plaintiffs' claims must fail[:]

As we held in *Electronic Lab. Supply Co. v. Cullen,* where the parties to the underlying suit agree jointly to end the underlying suit in a non-litigious nature, the liability of the underlying defendant, *i.e.,* the plaintiff in the wrongful use of civil proceeding[s] suit, is never determined with finality. 712 A.2d 304, 311 (Pa.Super.1998).

Therefore, the underlying suit is not a "favorable termination" within the meaning of ... 42 Pa.C.S. § 8351.

*Id.* at 311.

From the facts of record, there was never a final determination against Mr. Douglas or Mr. Natale on their counterclaims in the Prior Action. To the contrary, they agreed to a dismissal of the counterclaims in the context of a global settlement and as part of the Consent Verdict, the terms of which included a payment of money to Mr. Majorsky. As a matter of law, [Appellants] have not stated a cause of action for the wrongful use of civil proceedings, and the dismissal of this claim was fully merited by the facts of record.

T.C.O. at 24–25 (citations and punctuation modified for clarity).

Appellants contend that the question of whether the Prior Action was terminated in their favor is a question of fact, and that the trial court consequently usurped the jury's fact-finding function in dismissing this claim for failure to plead a cause of action upon which relief could be granted. In support, Appellants cite several distinguishable cases, none of which compels reversal. In *Bannar v. Miller,* 701 A.2d 242 (Pa.Super.1997), for example, this Court indeed noted that "[w]hether withdrawal or abandonment [of the underlying counter-claim] constitutes a final termination of the case in favor of the person against whom the proceedings are brought depends on the circumstances under which the proceedings are withdrawn." *Id.* at 247 (internal quotation marks and original modifications omitted). In that case, this Court **upheld** a plaintiff's Dragonetti Act verdict on the basis that the plaintiff's voluntary dismissal constituted a final determination in favor of the defendants. We did so because the peculiar, troubling evolution of that case, which suggested

beyond any credible doubt that the suit in question was brought for an improper purpose, "tend[ed] to establish neither [the plaintiffs] nor [the] attorneys were attempting to properly adjudicate the claim." This Court observed that "[a] last-second dismissal in the face of imminent defeat is not favorable to appellants. Appellants did not answer the bell in the fight they started, which is a victory for the other side." *Id.* at 248.

 Appellants herein have established no such basis to infer improper motive or bad faith. More importantly, they have cited no authority for the proposition that mutual entry of the Consent Verdict under the circumstances of the Prior Action constituted anything tantamount to the unbidden abandonment of a claim brought in bad faith, as was the case in *Bannar.* They fail to argue that Appellees were not diligent in pursuit of their counterclaim, relative to the procedural history of that case. The record indicates that the Consent Verdict had all the hallmarks of an amicable settlement of all claims, and this perception is corroborated by Appellants' subsequent Praecipe to Settle, Satisfy & Discontinue all claims. Consequently, we find no error in the trial court's determination as a matter of law that the Consent Verdict did not constitute a termination in favor of Appellants sufficient to permit a Dragonetti Act claim to reach a jury.

For all the foregoing reasons, we find that the trial court did not err as a matter of law or abuse its discretion in granting Appellees' second motion for summary judgment and dismissing all of Appellants' claims in connection therewith.

Order affirmed. Jurisdiction relinquished.